Blackwater Security Consulting, LLC et al v Nordan

Doc. 1 Att. 3

# EXHIBIT B



# INDEPENDENT CONTRACTOR SERVICE AGREEMENT

THIS AGREEMENT is dated as of \_\_March 25\_, 2004 and is by and between Blackwater Security Consulting, LLC, a Delaware Limited Liability Company ("BSC") and \_Mike R. Teague\_, an independent contractor residing at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

RECITALS

A. BSC is a Delaware Limited Liability Company that operates a business which provides security, protective, training and logistical and air support services in the United States and in foreign countries (the "Business"); and

B. Contractor is experienced in providing the Services utilized in the Business; and

C. BSC and a private entity or individual (the "Customer" or "Principal") have entered into a contract (the "Engagement") whereby BSC will conduct security and close protective operations in various locations, either domestically or overseas as they travel (collectively, the "Services"); and

D. Contractor has voluntarily agreed to serve as an independent contractor to BSC and to otherwise facilitate the Engagement; and

E. BSC desires to engage the services of Contractor and Contractor desires to provide services to BSC pursuant to the terms and conditions of this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the receipt and sufficiency of which is hereby acknowledged, the above recitals are incorporated in this Agreement, and the parties mutually agree as follows:

1. DEFINITIONS.

1.1 "Affiliate" shall mean any person, partnership, corporation, limited liability company, trust, member or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control of a shareholder or a shareholder's successor or assigns of BSC, including Blackwater Lodge and Training Center, Inc., Blackwater Target Systems LLC, Aviation Worldwide Services LLC ("AWS") and any and all of their Affiliates and shareholders, members or managers). The term "control" as used in the immediately preceding sentence, means, with respect to a corporation, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation, and, with respect to any person, partnership, limited liability company, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.2 "Air Service" or "Air Services" shall mean engaging in or providing services directly or indirectly as a pilot, navigator, flight engineer, mechanic or serving as a crew member in connection with any aircraft, rotorcraft, fight or other aviation transportation delivery or other aviation related services.

1.3 "Business Relationship" shall mean the employment, providing of services to or for and contracting with any individual or entity whose business is similar to that of BSC.

1.4 "Confidential Information" shall mean any and all information marked appropriately and exchanged between Contractor and BSC or Contractor and Customer and shall include any information which is confidential in nature concerning any matters affecting or relating to the business affairs of BSC or Customer, and their Affiliates, including but not limited to the following information:

> 1.4.1 the names, addresses, billing information, and requirements of any of BSC's or Customer's employees, clients, other Contractors, or suppliers contracting with BSC or Customer;
>
> 1.4.2 any and all information concerning the net worth, assets, liabilities, holdings, or present or future investments of BSC and any of its Affiliates;
>
> 1.4.3 any information concerning any and all proprietary technologies of BSC or Customer and any of its Affiliates;
>
> 1.4.4 any and all computer programs, software programs, system documentation, and manuals developed by BSC, Customer or any of their Affiliates in or for the operation of its business; and
>
> 1.4.5 Any and all information designated "Confidential" by BSC or Customer (by oral means, by writing or otherwise), including without limitation any and all reports, technical documents, maps, plans, recommendations, estimates, equipment, performance reports, subscriber lists, pricing information, studies, findings, inventions, ideas, drawings, specifications, parts lists, technical data, data bases, software in any form, flow charts, and other business and technical information. The Contractor agrees that the aforementioned categories of information are strictly confidential and/or trade secrets of BSC or Customer and that this Agreement is intended to protect and to include without limitation information, documents and programs that constitute Trade Secrets under any applicable State Statutes. The Contractor understands that use of this information by the Contractor in violation of this Agreement will result in irreparable damage to BSC or Customer. Contractor agrees not to use, or cause to be used, the aforementioned Confidential Information and trade secrets of BSC except for, and on behalf of, BSC. At the request of BSC, Contractor agrees to immediately surrender and deliver to BSC all tangible forms of the Confidential Information, trade secrets, documents, papers, and other records or property which Contractor may then possess or have under Contractor's control or which BSC provides to Contractor. Confidential Information shall not apply to any information which: (a) is disclosed in printed publications generally available to the public; (b) is disclosed in printed publications which become generally available to the public after disclosure through no fault of the Contractor; or (c)



Contractor can establish, by written documents, was in the Contractor's possession prior to the time of disclosure to Contractor by BSC.

1.5 "Commencement Date" shall mean the date that Contractor begins providing Services (defined herein) pursuant to this Agreement; it being specifically understood that there may be a gap in time between training and travel or training and Deployment.

1.6 "customer" shall mean any and all individuals, entities, corporations that have received any services from BSC prior to the Effective Date, including all individuals who have contracted services from BSC.

1.7 "Effective Date" shall mean the date when the last of BSC or Contractor signs this Agreement.

1.8 "Duty Station" shall mean Baghdad, Iraq and the surrounding regions /Countries or such other geographic place of performance as designated by BSC or Customer. Contractor acknowledges that the Contractor may be required to perform services pursuant to this Agreement in geographic locations other than the above-referenced location and that Contractor's Deployment to these alternative locations is a condition of this Agreement.

1.9 "Pay Period" shall mean a period of time equal to approximately thirty (30) days (or such other period as may be prescribed by BSC) during which Contractor shall be entitled to compensation in the amount set forth in Section 3.1 of this Agreement for services provided hereunder; provided, however, that payment for the last 30 days of a Deployment will be made to Contractor by BSC only upon Contractor's return to the U.S.

1.10 "Point of Hire" shall mean the city with an airport serviced by commercial airline carriers that is closest to Contractor's address as listed in the records of the Company.

1.11 "Restricted Activity" for the purposes of this Agreement shall mean any one or more of the following, without the prior written consent of BSC:
   (a) engage in or provide, directly or indirectly, services for any other companies or entities managing, employing or contracting with or consulting for a competitor of BSC or any of its affiliates, successors, and assigns in order to provide similar services to Customer as is contemplated under this Agreement;

   (b) join, be employed by, contract as an independent contractor for, or associate in a Business Relationship with individuals, companies or any entities, managing, employing or contracting with or consulting for a competitor of BSC or any of its affiliates, successors, and assigns in order to provide similar services to Customer as is contemplated under this Agreement; or

   (c) accepting employment with or becoming a partner of or acquiring greater than a five percent (5%) ownership interest in any partnership, corporation or other entity engaged in the practice or managing the practice of Services

to a competitor of BSC or any of its affiliates, successors or assigns in order to provide similar services to Customer as is contemplated under this Agreement.

1.12 "Transportation Costs" shall mean all expenses incurred by BSC for the transportation of Contractor from Contractor's address of record to the Duty Station and return transportation from the Duty Station.

2. POSITION/SERVICES. Contractor accepts the position as a security team member, reporting directly to any supervisor as may be designated by BSC or Customer from time to time. Pursuant to the terms of this Agreement, Contractor shall perform the duties and responsibilities customarily associated with this position in accordance with the rules, regulations and directives of BSC and any International, Federal, State, Local, Governmental agency laws and regulations.

3. FEES.

3.1 As of the Commencement, Contractor shall be entitled to compensation for Services performed hereunder in an amount equal to the following:

        Training Days:      $ 100 per day
        Travel Days:        $150 per day
        Per Diem:          Per JTR, for travel purposes only
        Deployment Days  $ 500 per day Static Security Line Supervisor
                                $ 500 per day Operations Support (T3)
                                $ 600 per day Operations Support (T2)
                                $ 600 per day PSD member (T2)
                                $ 600 per day K9 member (T2)
                                $ 625 per day PSD AIC
                                $ 650 Site manager (C1)

(the "Fees"). "Detail Days" shall mean each day that Contractor spends more than 12 hours in support of a BSC supported Personal Security Detail or operation. Contractor understands and acknowledges that he shall only be entitled to earn Fees from the Commencement Date, followed by up to ten days of standby on non-contract basis, and for detail days. Payment will be sent by regular mail to the address set forth below Contractor's signature or such other means as has been agreed to among BSC and Contractor.

3.2 Contractor will be reimbursed a per diem at JTR rates during detail days for meals and incidentals as authorized by the BSC with its prior consent and at its sole discretion; provided, that, to the extent meals are made available to Contractor by Customer or BSC, Contractor will not be entitled to a per diem for any such day. Contractor shall submit expense receipts [and per diem claim vouchers] to BSC at the conclusion of Contractor's Deployment. BSC will provide certain equipment and weapons in connection with the Engagement; provided, however, that Contractor may, with prior approval from BSC,



bring any personal equipment (understanding that BSC shall not be responsible for any loss or damage to such property).

4. GEOGRAPHIC LOCATION. The geographic location of this Agreement shall be at the Duty Station or such other location as directed by BSC or Customer. Contractor understands that the geographic location of any Deployment may change at any time.

5. TERM. The term of this Agreement shall be from the Commencement Date until the Termination Date (as defined below) (the "Term"). This Agreement may be extended by the parties hereto or by BSC's successor or assign, by written instrument executed by all parties to this Agreement. "Termination Date" shall mean the earlier to occur of (i) the termination date of the Engagement with BSC by the Customer, (ii) the three year anniversary date of the date of this Agreement and (iii) the Noticed Termination Date (as defined below). It is understood and agreed to by the parties that this Agreement may be applicable and govern the relationship between BSC and Contractor for multiple Deployments, i.e., the Contractor need not re-execute a copy of this Agreement to be bound by the terms and conditions herein for all BSC related Deployments or in each case that Contractor provide services to BSC.

6. WORK / ROTATION SCHEDULE. The normal work week shall be defined as commencing at 0001 hours Monday and ending at 2400 hours the immediately following Sunday. Work hours during such weeks will be scheduled at the sole discretion of BSC and the needs of Customer, but Contractor will be working 7 days per week during a Deployment. It is currently contemplated that each Contractor will be deployed overseas pursuant to this Agreement for a period of at least sixty days (60) days when a contract is in place that must be supported, excluding any travel days (each such round trip upon return to the U.S., a "Deployment"). Contractor understands and agrees that he is not entitled to Fees for any minimum time period if the Engagement or Contractor's Services are otherwise terminated for any reason or no reason whatsoever by BSC or Customer.

7. TAXES. Except for any withholding obligations imposed on BSC by any State or Federal law of the United States of America, Contractor hereby agrees and acknowledges that Contractor is solely responsible for the payment of all taxes, fees, and payments of any nature whatsoever due to governmental entities of any country incurred by reason of Contractor's acceptance of compensation and providing the Services under this agreement. All travel expenses under this Agreement are considered taxable income and will appear on the Contractor's Form 1099. Thus, Contractor shall retain all expense receipts for tax purposes. Both BSC have the right to examine such receipts for the purposes of verifying invoices. Any and all [per diem vouchers or] expense reimbursements will be made at the end of the Deployment.

8. TRANSPORTATION. BSC agrees to provide economy class air transportation for Contractor from Point of Hire to Duty Station. Notwithstanding anything to the contrary set forth in this Agreement, BSC further agrees to provide return air transportation for Contractor from Duty Station to Point of Hire upon termination of this Agreement.



Contractor expressly agrees and acknowledges that the transportation provided pursuant to this Section shall be for travel which is authorized for Contractor and by BSC only.

9. GOVERNMENT FACILITIES ABROAD. Contractor hereby agrees and acknowledges that Contractor shall be personally liable for any charges or fees incurred by Contractor at facilities operated by the Customer or any other third party that is not directly related to the Engagement, i.e., no personal expenses will be reimbursed.

10. PERFORMANCE DURING HOSTILITIES. Contractor agrees and acknowledges that the Services performed in the Duty Station, pursuant to this Agreement have been identified as being essential to BSC's complete performance under the terms of the contract between BSC and the Customer and notwithstanding the existence of hostilities or a state of war, whether declared or undeclared, Contractor agrees to perform his or her assigned duties until released from such duties by the Contractor's supervisor or the supervisor's designated representative.

11. CONTRACTOR ACKNOWLEDGMENT, RELEASE AND WAIVER.

>   11.1 Acknowledgment. Contractor agrees and acknowledges that due to the hazardous nature of the Duty Station and the Services to be provided hereunder, Contractor hereby expressly and voluntarily agrees to assume any and all risks of personal injury including, without limitation, death and disability which may result from Contractor providing Services pursuant to this Agreement. Contractor understands and acknowledges that the Duty Station is volatile, hostile and extremely dangerous and in some instances, military forces may be conducting continuing military operations in the region. Contractor understands and acknowledges that by voluntarily agreeing to participate in the Engagement, he is voluntarily, expressly and irrevocably assuming any and all known and unknown, anticipated and unanticipated risks which could result in physical or emotional injury, paralysis, death, or damage to himself, to his property, or to third parties, whether or not such injury or death is caused by other independent contractors to BSC, known and unknown domestic and foreign citizens or terrorists or U.S. governmental employees. The risks include, among other things and without limitation, the undersigned being shot, permanently maimed and/or killed by a firearm or munitions, falling aircraft or helicopters, sniper fire, landmine, artillery fire, rocket propelled grenade, truck or car bomb, earthquake or other natural disaster, poisoning, civil uprising, terrorist activity, hand to hand combat, disease, poisoning, etc., killed or maimed while a passenger in a helicopter or fixed wing aircraft, suffering hearing loss, eye injury or loss; inhalation or contact with biological or chemical contaminants (whether airborne or not) and·or flying debris, etc. Contractor fully appreciates the dangers and voluntarily assume these risks as well as any other risks in any way (whether directly or indirectly) connected to the Engagement. Contractor understands and agrees that Contractor is solely responsible for obtaining any and all liability insurance, short and long term disability, workers compensation, medical or dental benefits and medical evacuation insurance and therefore understands and



agrees that BSC is not responsible for obtaining any such insurance on Contractor's behalf. Contractor hereby expressly agrees and acknowledges that the Fees without additional benefits which may be provided to Contractor, is full and fair consideration for Contractor's covenants hereunder.

11.2 Release. Except as to any contractual benefits expressly provided herein, Contractor, on behalf of Contractor and Contractor's spouse, heirs, administrators, estate, personal representatives, successors and assigns (collectively referred to as "Contractor's Group"), hereby releases and forever discharges BSC, AWS and all of their agents, owners, shareholders, officers, members, managers, employees, directors, subcontractors, Affiliates and representatives, successors and assigns (collectively referred to as "Releasees") from any and all claims, judgments, awards, actions and causes of action which may be asserted now or in the future by Contractor's Group for any liability whatsoever for accident, injury (including without limitation, death or disability), losses, loss of consortium, expenses, loss of income and other damages based upon or in any way arising from Contractor's performance of Services pursuant to this Agreement and the transportation of Contractor, including, without limitation, loss of life, loss or damage to property, irrespective of where (or by whom) such accident, injury, loss of life, loss or damage to property occurs, whether as a result of negligence, gross negligence, omissions or failure to guard or warn against dangerous conditions, use, structure or activity, or any other cause, arising from Contractor's participation in the Engagement or any other activity on or off of Releasees' premises or Contractor's use of BSC, Customer equipment and facilities even if such injury was caused in whole or in part by the negligence of Releasees.

11.3 Covenant Not to Sue. The Contractor further agrees and covenants not to file, prosecute, bring, maintain or in any way proceed on any claim, suit, civil action, complaint, arbitration or administrative action or proceeding of any kind in any municipal, state, federal agency, court, or tribunal against Releasees with respect any of the foregoing facts, occurrences, events, transactions, damages, injuries, claims, causes of action and other matters released in Section 11.2.

11.4 Liquidated Damages. The parties hereto expressly agree that in the event of Contractor's death or injury based upon or in any way arising from Contractor's performance of Services pursuant to this Agreement and the transportation of Contractor, even if such injury was caused in whole or in part by the negligence of Releasees, Contractor's Group has no recourse whatsoever against BSC. Contractor understands and agrees that if he is hurt or killed during Contractor's performance of Services pursuant to this Agreement or the transportation of Contractor, Contractor has no recourse whatsoever against Releasees.

12. LIMITATIONS ON AUTHORITY. Unless BSC has given Contractor its express written consent, Contractor has no actual, apparent, or implied authority to:

12.1 Pledge the credit of BSC or any of BSC's other Contractors.

7
Blackwater Security Consulting IC Contract
ESS/RHHS Support Operations

12.2 Bind BSC under any contract, agreement, note, mortgage or otherwise.

12.3 Release or discharge any debt due to BSC unless BSC has received the full amount thereof.

12.4 Sell, mortgage, transfer or otherwise dispose of BSC's assets.

13. CONDUCT OF CONTRACTOR. Contractor will directly report to the Customer or BSCs' leaders, as the case may be, who have been appointed from time to time by Customer or BSC. Contractor agrees and acknowledges that Contractor shall comply with all laws and regulations of the United States, any country where Contractor is a citizen or resident and the host country, including but not limited to laws related to currency, black market, and drug and alcohol use. Contractor shall abide and obey local customs and shall at all times exhibit the highest moral and ethical conduct. Personal attire and hygiene shall be maintained in accordance with BSC or Customer policies. Contractor agrees and acknowledges to abide by all rules and regulations of BSC including BSC's Drug Policy and any other policies and procedures set forth by BSC or Customer. Contractor hereby consents to pre-deployment and periodic random drug testing in connection with the Engagement and the performance of Services hereunder. Contractor has been briefed on the rules of engagement and has reviewed and understands such rules and regulations pertaining to the use of force. The Contractor understands and agrees that introduction, possession, use, sale, transfer, manufacture, or consumption of any alcoholic beverages or controlled substances is strictly prohibited during the Engagement.

14. CONTRACTOR REPRESENTATIONS AND WARRANTIES. To induce BSC into entering into this Agreement, Contractor hereby represents and warrants as follows:

14.1 Contractor is in good health and is physically capable of performing his obligations under this Agreement. Contractor agrees and acknowledges that this Agreement is contingent upon Contractor remaining in good physical and mental health as necessary to fully perform his obligations under this Agreement.

14.2 If Contractor is a pilot, Contractor is a duly licensed aircraft pilot by the Federal Aviation Administration for Contractor's position and Contractor's license is current and active and no legal, administrative or other proceedings which may affect Contractor's ability to perform services hereunder are pending or contemplated as of the Effective Date of this Agreement. Further, Contractor's medical certificate is current as described by Federal Aviation Regulation Part 67 ("FAR"), if required for Contractor's position.

14.3 Contractor has no prior arrest or criminal convictions and has never been charged, indicted or convicted of a domestic violence crime of any kind (albeit a misdemeanor or a felony).

14.4 There is no other reason which would prevent Contractor from fully performing Contractor's obligations pursuant to this Agreement.

14.5 Contractor has his own liability, short and long term disability insurance, life insurance, etc.

## 15. RESTRICTIVE COVENANTS.

15.1 Confidential Information. The Contractor shall not, at any time during the period of providing Services under this Agreement and for a period of five (5) years after termination of this Agreement (or such additional time as required by law) for any reason, including the expiration of the term of this Agreement, either directly or indirectly, divulge, publish, disclose or communicate to any person, firm, or other entity, except as part of Contractor's duties as described in this Agreement, in any manner whatsoever, or appropriate for the Contractor's personal benefit or a benefit of a third party, whether or not the Contractor receives remuneration, any Confidential Information.

15.2 Non-Competition/Non-Solicitation Restrictions. While the Contractor is providing Services to BSC, and for a period of eighteen (18) months from the date of termination of the Contractor's period of performing Services or the expiration of the term of this Agreement, the Contractor shall not, directly or indirectly, whether as a consultant, agent, advisor, sole-proprietor, Contractor, independent contractor, partner, stockholder, owner, or in any other capacity individually, or for the benefit of any person, firm, corporation, or other entity:

15.2.1 compete with BSC by engaging in a Restricted Activity; or,

15.2.2 call upon, solicit, divert, take away, deliver to, canvas, contact, sell, provide services of any kind, or otherwise deal with any Customers of BSC; or,

15.2.3 assist any other individual or entity in soliciting, contacting, diverting, providing services of any kind, selling, or calling upon any Customers of BSC; or

15.2.4 hire, employ, solicit, engage, or associate in any business activity with any individuals who were Contractors of BSC during the time period in which the Contractor was providing services to BSC.

15.3 No Compensation Required. The restrictions set forth in this Agreement shall apply whether or not the Contractor receives compensation or consideration for the Services or acts which would otherwise violate the terms of this Agreement. Additionally, the covenants on the part of the Contractor set forth in this Section (and all Subsections hereof) shall be, and hereby are, deemed to be independent covenants of this Agreement which shall expressly survive termination of this Agreement or a determination that other provisions of this Agreement are invalid or unenforceable, or that BSC has breached the terms of this Agreement.

15.4 Contractor Acknowledgment. Contractor hereby acknowledges and agrees that: (a) this Agreement and the restrictions set forth herein are necessary for the protection of the legitimate business interest of BSC and are intended to be construed and enforceable as valid restraints pursuant to any applicable State Statute; (b) the execution and delivery of this Agreement is a mandatory condition precedent to entering into this Agreement and the providing of Services by Contractor hereunder; (c) the scope of this Agreement and the restrictions are reasonable in time, scope and geography; (d) Contractor does not have any intention of competing, soliciting or disclosing Confidential Information as restricted herein within the scope, area and time limits set forth herein above; (e) Contractor recognizes that a violation of any provision of this Agreement would be deleterious to and could cause severe economic impact on a portion of or all of BSC's business, and that such violation would be an unfair competition against BSC; (f) Contractor represents that upon termination of providing Services to BSC hereunder, the Contractor's experience and capabilities are such that the Contractor can obtain reasonable employment commensurate with the Contractor's education, training, and experience that will not violate the terms of this Agreement.

15.5 Adjustment. If any provision of this Agreement is determined or adjudged by a court to be invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. The parties to this Agreement intend for this Agreement to be enforced as written. If any provision, or part thereof, however, is held to be unenforceable because of the duration or scope thereof, or the area covered thereby, all parties agree that the court or arbitrator (if applicable) making such determination shall have the power to reduce the duration and/or area or scope of such provision to the extent necessary for such provision to be then enforceable. The existence of any cause of action of Contractor against BSC shall not constitute a defense to BSC's enforcement of these restrictive covenants.

15.6 General Remedies. The Contractor hereby acknowledges and agrees that BSC shall be entitled to all equitable remedies, including, without limitation, specific performance and injunctive relief to enforce the terms and provisions of this Agreement and the restrictive covenants set forth herein. Contractor does hereby waive any proof that such breach would cause irreparable injury to BSC or that there is no adequate remedy at law.

15.7 Liquidated Damages. It is expressly agreed by and between the parties to this Agreement that it is impractical and extremely difficult to fix actual damages which may result from the Contractor's failure to comply with the provisions of the Restrictive Covenants in this Agreement for one or more of the following reasons: (a) the difficulty of BSC to prevent a breach of this Agreement by the Contractor; (b) the difficulty of BSC to calculate actual damages and loss of

business resulting from a breach by the Contractor in violation of this Agreement; (c) the difficulty to ascertain the impact of a breach of this Agreement on BSC's Customer and business; and (d) the difficulty that BSC may experience in obtaining timely injunctive relief. Therefore, it is expressly agreed by and between the parties that in the event the Contractor violates the terms or provisions of the Restrictive Covenants contained in this Agreement, then BSC shall be entitled to receive liquidated damages from the Contractor and the Contractor shall pay within five (5) days of notice from BSC, the total sum of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00). The liquidated damages shall be due and payable in a lump sum to BSC. It is expressly acknowledged by the Contractor that said payment shall not be interpreted nor construed as a penalty but is in fact a good faith attempt to fix damages which BSC will suffer in the event of a breach of the Restrictive Covenants. It is also agreed that this provision for liquidated damages shall not be construed to restrict BSC's right to injunctive relief but shall be BSC's exclusive remedy at law for damages.

## 16. TERMINATION.

16.1 Termination Without Cause and Without Notice. Contractor hereby acknowledges that BSC may terminate this Agreement and Contractor's Services hereunder without notice at any time with or without cause without advance notice for any reason or no reason whatsoever. In the event that Contractor is discharged pursuant to this Section, Contractor shall be entitled to compensation as provided herein for services provided to the date and hour of discharge only; provided that Contractor shall not be entitled to receive his final compensation until after returning to the U.S. The Contractor shall be responsible for reimbursement to BSC for any advanced amounts for transportation, per diem or any other costs described in Sections 3, 8, 9, 15.7, and 16 and that such amounts are subject to the provision of Section 16.4 herein.

16.2 Termination by Contractor. Contractor may terminate this Agreement only in the event that BSC fails to pay Contractor any undisputed compensation amount; provided, however, that Contractor provides BSC with written notice of such failure and BSC fails to make payment within ten (10) days from the date BSC receives written notice. Contractor hereby agrees and acknowledges that because of the nature of the Services provided to Customer and the resulting obligations of BSC to third parties, Contractor shall not have the right to terminate this Agreement without cause and Contractor hereby expressly waives the right to assert in any action or proceeding that this Agreement is lacks mutuality of obligations between the parties. In the event that Contractor voluntarily (i.e., not at the direction of BSC or Customer) refuses to fulfill his minimum Deployment commitment (as set forth in Section 6), Contractor shall have an amount equal to $200.00 times the number of days short of his sixty (60) day Deployment commitment deducted from his final payment. The parties understand that BSC may cancel this Agreement at any time for any reason or no reason at all upon notice to the other party (the "Noticed Termination Date"); provided, however that (i) if Contractor voluntarily refuses to fulfill his minimum Deployment commitment, such date shall be

considered the Noticed Termination Date and Contractor shall be penalized as set forth above and (ii) upon termination of this Agreement, termination of Services or at the end of a Deployment, as the case may be, Contractor will be required to return to the United States before he is entitled to payment of any outstanding Fees.

16.3 Termination Does Not Affect Restrictive Covenants. Notwithstanding anything to the contrary contained in this Agreement, the termination of this Agreement by either party for any reason shall not affect the validity or enforceability of the restrictive covenants set forth in Sections 15.1 through 15.7. All provisions shall expressly survive the termination of this Agreement.

16.4 Set-Off. Contractor hereby agrees and acknowledges that BSC shall have the right to set-off and deduct from any salary and bonus otherwise due the Contractor an amount equal to any indebtedness of the Contractor to BSC and any and all losses, damages, Transportation Costs, and advanced per diem amounts pursuant to Sections 3, 8, 9, 15.7, and 16, and any other costs, expenses and attorney fees incurred by BSC as a result thereof.

16.5 BSC Assets. Contractor agrees that upon termination providing Services to BSC under this Agreement, all proprietary interests of BSC and its business assets, tangible or intangible, which Contractor deals with or develops, shall remain the sole or exclusive property of BSC and in no event shall Contractor acquire any interest therein or right to use same without the express written permission of BSC. Contractor agrees that in the event he ceases to provide services to BSC, he shall promptly return to BSC, all documents, forms, contracts, lists, maps, completed work or work in progress relating to the affairs of BSC and any personal property of BSC in his possession at the time of termination. All title to supplies, financial records, maps, charts, records, Customer information, equipment and furnishing shall remain the sole property of BSC.

17. INDEMNIFICATION. Contractor hereby agrees to indemnify and hold harmless BSC, its shareholders, officers, directors, Contractors, Affiliates, representatives, successors and assigns from any and all claims, judgments, awards, actions, causes of action, liabilities, asserted by anyone for damages, debts, costs, expenses, obligations and liabilities relating to or in any way arising from the following:

    17.0.1 Contractor's failure to pay taxes as set forth in this Agreement;

    17.0.2 Contractor's use of facilities or equipment owned and operated by BSC, Blackwater Lodge and Training Center, Inc., AWS or Customer;

    17.0.3 Contractor's violation of Sections 12 and 16 hereof;

    17.0.4 Contractor's breach of any restrictive covenants set forth herein;

    17.0.5 Contractor's breach of any of Contractor's representations and warranties set forth in this Agreement;

17.0.6 Any of the Liabilities for which Contractor has agreed to hold harmless BSC herein;

17.0.7 Contractor's failure to obtain any protective insurance, including, medical and dental insurance, short and long term disability insurance, workers compensation insurance, life insurance or medical evacuation insurance; and

17.0.7 Contractor's breach of any of the terms of this Agreement.
The Indemnification procedures identified in Schedule 17 are attached hereto and deemed a part of this Agreement.

18. DRUG TESTING. Contractor hereby agrees and acknowledges that it is a condition of providing Services to BSC under the terms of this Agreement that all Contractors refrain from using drugs on and off the job. For purposes of assuring compliance with this Section, Contractor hereby consents to be tested for among other things, any or all of the following substances: (i) alcohol; (ii) amphetamines; (iii) cannabinoids; (iv) cocaine; (v) phencyclidine (PCP); (vi) methaqualone; (vii) opiates; (viii) barbiturates; (ix) benzodiazepines; (x) synthetic narcotics including, without limitation methadone and propoxypene, upon request by BSC.

19. NOTICES. Any notice, request, demand, consent, approval or other communication required or permitted under this Agreement (collectively a "notice") shall be (a) in writing, and (b) addressed by the sender to the other party at the address and in the manner set forth below:

If to BSC: Blackwater Security Consulting LLC
Attn: Brian Berrey, Director
850 Puddin Ridge Road
Moyock, NC 27958
Fax No.: (252) 435-6388

If to Contractor: To such Contractor's residential address on file with BSC. Except as otherwise provided in this Agreement, each notice shall be effective and shall be deemed delivered on the earlier of: (i) its actual receipt, if delivered personally, by telefax, courier service, or, (ii) on the third (3rd) day after the notice is postmarked for mailing by first-class, postage prepaid, certified or registered, United States mail, with return receipt requested (whether or not the return receipt is subsequently received by the sender).

20. MISCELLANEOUS PROVISIONS.

20.1 Law/Exclusive Venue/Arbitration. This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, applicable to contracts made and to be fully performed therein, excluding its conflict of laws principles. Contractor and BSC hereby agree that any dispute regarding interpretation or enforcement of any of the parties' rights or obligations under this Agreement shall be

resolved by binding arbitration according to the rules of the American Arbitration Association and shall be conducted in Currituck or Camden County in North Carolina. The arbitrators may award attorneys fees to the prevailing party in any arbitration proceeding. All costs and expenses of the arbitration, including actual attorney's fees, shall be allocated among the parties according to the arbitrator's discretion. The arbitrator's award may be confirmed and entered as a final judgment in the courts noted above and enforced in accordance with rules of the American Arbitration Association. Proceeding to arbitration and obtaining an award thereunder shall be a condition precedent to the bringing or maintaining of any action in any court with respect to any dispute arising under this Agreement, except for the institution of a civil action of a summary nature where the relief sought is predicated on there being no dispute with respect to any fact or relief of an injunctive nature. Contractor hereby waives any rights to seek removal of any dispute to the state or federal courts.

20.2 Entire Agreement. This Agreement, and any agreements incorporated herein, contain the entire agreement of the parties on the subject matter hereof, and replace any prior agreement or agreements between BSC and Contractor in their entirety. This Agreement may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought. The parties hereto waive any right to assert in any proceeding that they were induced to enter into this Agreement by any promise, fact, occurrence, warranty, statement, contract, representation, or agreement (collectively "Representation") which is not expressly set forth in this document and all such Representations are merged herein.

20.3 Time. For all purposes of this Agreement time is of essence.

20.4 Counterparts/Facsimile. This Agreement may be executed in several counterparts, each of which shall be deemed an original and such counterparts shall together constitute and be one and the same instrument. A telefaxed copy of this Agreement and all signatures thereon shall constitute an original for all purposes.

20.5 Construction of Agreement. This Agreement has been prepared by the attorneys for BSC and the parties have read and negotiated all of the language used in this Agreement. The parties acknowledge and agree that because all parties (and their counsel to the extent Contractor requested that they review the Agreement) participated in negotiating and drafting this Agreement, no rule of construction shall apply to this Agreement which construes any language, whether ambiguous, unclear or otherwise, in favor of, or against any party by reason of that party's role in drafting this Agreement.

20.6 Termination of Prior Contract. Contractor agrees and acknowledges that any prior contract between BSC and Contractor is hereby terminated. Notwithstanding the foregoing, all restrictive covenants regarding proprietary and confidential information contained in any prior contract shall remain in full force and shall binding on Contractor.

20.7 Commission Warranty. Contractor represents and warrants to BSC that Contractor has not engaged the services of any broker, agent, employment agency or other individual entity which will or is entitled to claim any commissions, fees or other amounts in connection or in any way relating to this Agreement or his Services hereunder. Contractor shall defend, indemnify and hold BSC harmless from any and all fees, commission claims, causes of action, attorney fees, obligations or liabilities of any agent, broker or employment agency in any way relating to Contractor's association with BSC pursuant to this Agreement.

20.8 Headings. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

20.9 Gender. Any reference herein to the masculine, the feminine or the neuter shall include the masculine, the feminine and the neuter, and any reference to the singular or plural shall include the opposite thereof, as the context so requires.

20.10 Waiver of Jury Trial. The parties hereto knowingly, voluntarily, and intentionally waive the right any of them may have to a trial by jury in respect to any litigation arising out of, under, or in connection with this Agreement and any other agreements contemplated to be executed in connection herewith, or any course of conduct, course of dealings, statements (whether verbal or written), or actions of any party (including, without limitation, any action to rescind or cancel this Agreement and any claims or defenses asserting that this Agreement was fraudulently induced or is otherwise void or voidable); this waiver being a material inducement for BSC to enter into this Agreement with Contractor.

20.11 Legal Expenses. In the event BSC is required to take action against Contractor to enforce the term, covenants and conditions of this Agreement and Release, or to mediate an action brought by the other party, BSC shall be reimbursed by Contractor for such costs as may be incurred in such action, including any appeal there from, including reasonable attorney's fees, costs and other fees, not to exceed insurable limits.

20.12 Execution of Documents. If, during the performance under this Agreement, the Contractor assumes the custody of BSC funds or takes possession of property of any nature whatsoever and wherever situated, which property has in fact been purchased with monies of BSC, the Contractor hereby recognizes and acknowledges the existence of a trust relationship, either express or constructive, and agrees to execute whatever documents that may be required by BSC to evidence this relationship.

20.13 Recital. The parties hereby acknowledge and agree that the terms of this Agreement and Release are contractual and not a mere recital and there are not any other agreements, understandings or representations made by BSC except as expressly stated in this Agreement and Release. Further, Contractor agrees that if any provision of this Agreement and Release is found to be unenforceable, the remaining terms shall remain in full force and effect.



20.14 Non-Publicity. This Agreement and the Engagement and all aspects associated with the Engagement is classified. It is a material condition of this Agreement (and a legal obligation of Contractor) that the Contractor shall not disclose any information whatsoever relating to the Engagement or use or allow to be used any aspect of this Agreement for publicity or advertisement purposes. It is further understood that this obligation does not expire upon completion or termination of this Agreement, but continues indefinitely. It is further agreed that this contractual relationship shall not be disclosed except as allowed by law or regulation.

20.15 Independent Contractor. Contractor acknowledges that it is solely an independent contractor. Nothing contained in this Agreement shall be deemed to constitute either BSC, the Contractor or Customer as an agent, representative, partner, or joint venture or employee of the other party for any purpose. Neither party can bind the other to any agreement with anyone else nor can either party can bind the other to any agreement that compels the other to divulge information regarding agreements, contracts or obligations to/with outside parties. Contractor understands that he is not entitled to any employee benefits from BSC, including workers' compensation benefits, life insurance, long term disability, health and dental benefits, participation in 401k plan or any other benefits.

20.16 Waiver. By signing this document, Contractor acknowledges that if Contractor is hurt or his property is damaged while providing Services hereunder, the intent is that Contractor and Contractor's Group is bound by this Release and Indemnification and therefore will be found by a court of law to have waived his right to maintain a lawsuit against BSC on the basis of any claim from which Contractor has released them herein.
20.17 Survival. The provisions of Sections 1, 7, 8, 9, 11, 12, 14, 15, 16.3, 16.4, 16.5, 17, 18, 19 and 20 (and all subsections thereof) of this Agreement shall survive the execution of and any termination of this Agreement.

_____
Brian Berrey, Director
BLACKWATER SECURITY CONSULTING LLC

Signature: Mike R. Teague
Print Name: Mike R. Teague
Address: ███████████
Phone: ███████████

Emergency Contact Information
Name: Rhonda Teague
Phone ███████████
e-mail ███████████
Mother's maiden name: ███████████

## SCHEDULE 17
## INDEMNIFICATION PROCEDURES

Any party claiming indemnification under this Agreement is referred to as the "Indemnified Party" and any party against whom any such claim is asserted is referred to

as the "Indemnifying Party". All claims for indemnification by an Indemnified Party under this Section shall be asserted and resolved as follows:

If any claim, for which an Indemnifying Party would be liable for damages to an Indemnified Party hereunder, is asserted against or sought to be collected from such Indemnified Party by a third party (a "Third Party Claim"), the Indemnified Party, promptly after the Third Party Claim is so asserted, shall notify the Indemnifying Party of such Third Party Claim, enclosing copies of all papers served, (the "Claim Notice"). Notwithstanding the foregoing, the Indemnifying Party shall be obligated to indemnify the Indemnified Party with respect to any such Third Party Claim except to the extent that a failure to promptly notify the Indemnifying Party in accordance with the foregoing provisions of this Section actually prejudices the Indemnifying Party's ability to defend against the Third Party Claim. The Indemnifying Party shall have five (5) days from the delivery of the Claim Notice (the "Notice Period") in which to notify the Indemnified Party whether the Indemnifying Party disputes the obligation to provide an indemnity for such Third Party Claim or whether the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against such Third Party Claim.

If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party does not dispute its liability to the Indemnified Party, then the Indemnifying Party shall have the right to defend, at its sole cost and expense, such Third Party Claim by all appropriate proceedings, which proceedings shall be diligently prosecuted by the Indemnifying Party to a final conclusion or settlement. The Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that the Indemnified Party shall be authorized, at its sole cost and expense, to file during the Notice Period any motion, answer or other pleading which the Indemnified Party and the Indemnifying Party shall deem necessary or appropriate to protect the respective interests of the Indemnified Party and the Indemnifying Party; provided, further, however, that if requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim which the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person or entity asserting the Third Party Claim or any cross-complaint against any person or entity. The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section, and, except as provided in the preceding sentence, the Indemnified Party shall bear its own costs and expenses with respect to such participation.

If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party does not dispute its liability to the Indemnified Party and that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Section, or if the Indemnifying Party fails to diligently and promptly prosecute the Third Party Claim or to settle it, or if the Indemnifying Party fails to give any notice whatsoever within the Notice Period, then the Indemnified Party shall have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate

proceedings, which proceedings shall be promptly and vigorously prosecuted by the Indemnified Party to a final conclusion or settlement, in the discretion of the Indemnified Party. The Indemnified Party shall have full control of such defense and proceedings, including any compromise or settlement thereof. Notwithstanding the foregoing provisions, if the Indemnifying Party has notified the Indemnified Party within the Notice Period that the Indemnifying Party disputes its liability to the Indemnified Party and if such dispute is resolved in favor of the Indemnifying Party by a final, non-appealable order of a court of competent jurisdiction, then the Indemnifying Party shall not be required to bear the costs and expenses of the Indemnified Party's defense or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party shall be obligated to reimburse the Indemnifying Party in full for all costs and expenses incurred in connection with such litigation on demand. The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section, and the Indemnifying Party shall bear its own costs and expenses with respect to such participation.

In the event any Indemnified Party shall have a claim against any Indemnifying Party hereunder which does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party by a third party, then the Indemnified Party shall notify the Indemnifying Party of such claim by the Indemnified Party, specifying the nature of and the specific basis for such claim and the amount of or the estimated amount of such claim (the "Indemnity Notice"). If the Indemnifying Party does not notify the Indemnified Party within twenty (20) days from the delivery of the Indemnify Notice that the Indemnifying Party disputes such claim, the amount or estimated amount of such claim specified by the Indemnified Party shall be conclusively deemed a liability of the Indemnifying Party hereunder. However, if the Indemnifying Party has timely disputed such claim, as provided above, then such dispute shall be resolved by mutual agreement of the Indemnified Party and the Indemnifying Party or by litigation in any appropriate court of competent jurisdiction.