IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:05-CV-48-FL(1)

| | |
|---|---|
| RICHARD P. NORDAN, as Ancillary Administrator for the separate Estates of STEPHEN S. HELVENSTON, MIKE R. TEAGUE, JERKO GERALD ZOVKO and WESLEY J.K. BATALONA, <br><br> Plaintiff, <br><br> v. <br><br> BLACKWATER SECURITY CONSULTING, LLC; BLACKWATER LODGE AND TRAINING CENTER, INC., and JUSTIN L. McQUOWN, <br><br> Defendants. | FILED <br> AUG 1 1 2005 <br> FRED L. BORCH III, CLERK <br> US DISTRICT COURT, EDNC <br> BY _____ DEP. CLK <br><br> ORDER |

This matter is before the court on defendants' motions to dismiss (DE #'s 5 & 8), and plaintiff's motion to remand (DE #12). Plaintiff responded in opposition to the motions to dismiss, and defendants responded in opposition to the motion to remand. In this posture, the issues raised are ripe for ruling. For the reasons that follow, the court grants plaintiff's motion to remand and denies as moot defendants' motions to dismiss.

STATEMENT OF THE CASE

Plaintiff commenced this action on January 5, 2005, in the Superior Court of Wake County, North Carolina, asserting claims arising out of the deaths of four security personnel assigned to work in the vicinity of Fallujah, Iraq. In the complaint, plaintiff asserts two state law claims for wrongful death and fraud.

On January 24, 2005, defendants filed a notice of removal in this court asserting federal question jurisdiction on the basis of "complete preemption" and "unique federal interests." (Notice of Removal, ¶¶ 34, 36). On January 31, 2005, defendants Blackwater Security Consulting, LLC, and Blackwater Lodge and Training Center, Inc. ("Blackwater") filed a motion to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), on the basis of a defense of preemption under the Defense Base Act ("DBA"), and for failure to state a claim. On February 1, 2005, defendant Justin L. McQuown ("McQuown") filed a motion to dismiss, pursuant to Rule 12(b)(6), also asserting a defense of preemption under the DBA or the related Longshore and Harbor Workers' Compensation Act (LHWCA).

On February 11, 2005, plaintiff filed a motion to remand to state court, arguing that the complaint only asserts state law claims, and that the DBA and LHWCA do not completely preempt the asserted claims. On March 7, 2005, defendants responded in opposition to the motion to remand, attaching copies of contracts referenced in the complaint and compensation benefits decisions by the United States Department of Labor, pertaining to the decedents in this action. Plaintiff replied on March 17, 2005, objecting to consideration of evidence outside the complaint, and arguing that neither complete preemption nor unique federal interests served to establish jurisdiction in this case. Plaintiff also responded to defendants' separate motions to dismiss, to which defendants have replied.

## STATEMENT OF ALLEGED FACTS

The facts alleged in plaintiff's complaint may be summarized as follows. On March 8, 2004, defendant Blackwater, and another entity, Regency Hotel and Hospital Company ("Regency") entered into a contract ("security contract") with ESS Support Services Worldwide ("ESS") to provide security services "for ESS's catering operations in the Middle East." (Compl., ¶21). On March 12,

2004, defendant Blackwater entered into a sub-contract ("sub-contract") with Regency, which gave defendant Blackwater control over security details. On March 25, 2004, Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko and Wesley J.K. Batalona (hereinafter the "decedents") entered into "Independent Contractor Service Agreements" with Blackwater, which expressly incorporated the terms of the sub-contract and contract.

At the time the decedents entered into the Independent Contractor Service Agreements, Blackwater representatives told them that they would be performing security services in Iraq, with the following precautions mandated by the primary contract:

> A. "[E]ach security mission would be handled by a team of no less than six (6) members."
> B. "[E]ach security mission would be performed in armored vehicles."
> C. "[S]ecurity teams would be comprised of at least two armored vehicles, with at least three security contractors in each vehicle, which would provide for a driver, a navigator, and a rear-gunner.
> D. "[T]he rear-gunner would have a heavy automatic weapon, such as a 'SAW Mach 46,' which could fire up to 850 rounds per minute, allowing the gunner to fight off any attacks from the rear."
> E. There would be "at least 24-hours notice prior to any security mission."
> F. "[E]ach security detail mission would be subject to a Risk Assessment completed prior to the mission, and that if the threat level was too high, they would have the option of not performing the mission."
> G. There would be an "opportunity to review the travel routes, gather intelligence about each mission, do a pre-trip inspection of the route and determine the proper logistics to carry out the security detail."
> H. The security detail "would arrive in the Middle East and have at least 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through the area."

(Compl., ¶13). The decedents relied upon these representations in entering into the Independent Contractor Security Agreements.

In preparing decedents for work under the Independent Contractor Security Agreements, Blackwater representatives conducted training and preparation programs for security missions in Iraq.

3

One of the representatives who conducted training, defendant McQuown, "failed to provide adequate training and intelligence data" to decedents, (Compl., ¶28), and "harbored extreme animosity toward decedent Scott Helvenston relating to Helventson's superior credentials, abilities, training, education, experience and knowledge." (Compl., ¶40).

Furthermore, plaintiff alleges that the training programs and preparations provided for decedents were compromised by defendant Blackwater's interest in higher profits. Decedents were not given twenty-one (21) days preparation time prior to operations in Iraq, and, as such, were not permitted to become acclimated to the area, learn the lay of the land, gather intelligence, or learn safe routes through Iraq. Rather, on March 27, 2004 they "were advised that they would be leaving in two days for Baghdad to start their first mission." (Compl., ¶43). Specifically, although decedent Helvenston was physically ill, defendant McQuown ordered Helvenston to depart for Baghdad at 5:00 a.m. on March 29, 2004, to join the three other decedents for a security mission.

On March 30, 2004, Helvenston, Teague, Zovko and Batalona were directed to conduct a security mission for Blackwater. Pursuant to mission directions, the decedents were required to "escort three ESS flatbed trucks" carrying food supplies, "from the City of Taji to a U.S. Army base in Iraq," known as Camp Ridgeway, on the outskirts of the City of Fallujah. (Comp., ¶¶ 21, 57, 59). At the time, Fallujah was "universally known to be extremely hostile territory in control of Iraqi insurgents." (Compl., ¶59).

Even though the decedents were entering hostile territory, defendant Blackwater failed to provide the decedents with the protections, tools and information that it initially promised to provide. Specifically, a Blackwater representative refused to provide maps of the area and told decedents that it was "too late for maps." (Compl., ¶55). In addition, defendant did not provide them with the

4

minimum number of six members on the security detail team, although six members were available. Defendant did not provide them with armored vehicles, and defendant did not permit them to have three team members in each vehicle, which resulted in each vehicle containing only a driver and a navigator, but no rear-gunner to quell any attacks.

Moreover, it is alleged, defendant did not provide them with heavy automatic machine guns, but instead merely with semi-automatic rifles, which had not even been tested or sighted. Likewise, defendant did not provide decedents with twenty-four (24) hours notice or a Risk Assessment prior to the March 30, 2004 security mission. Finally, defendant did not provide them with the opportunity to gather intelligence concerning the travel route or to do a pre-route inspection. In sum, the decedents were obligated to set out on their mission grossly under-prepared for the risks they faced.

Because the decedents "had not been able to perform a pre-trip analysis of their route and [were] denied maps and logistical information concerning the area, they set out toward Camp Ridgeway on a road which led directly through the heart of the hostile Fallujah." (Compl., ¶60). "Unbeknownst to them, there was an alternative, safer route which led around the outskirts of Fallujah and would have only taken them approximately two and a half hours longer to get to Camp Ridgeway." (Id.).

"Without having any information about the route or even a map of the area, they became lost and ended up driving through the center of the City of Fallujah." (Compl., ¶17). "While stopped in traffic, several armed Iraqi insurgents walked up behind these two unarmored vehicles and repeatedly shot these four Americans at point blank range, dragged them from their vehicles, beat, burned and disfigured them and desecrated their remains." (Id.). In particular, "two of the burnt bodies were strung up from a bridge over the Euphrates River for all of the world to see." (Compl., ¶61).

5

In support of the wrongful death claim, plaintiff alleges that "[w]hen the Defendants sent Helvenston, Teague, Zovko and Batalona out on this security mission in this condition, without the proper protections, tools and information, they knew that they were sending them into the center of Fallujah with very little chance that they would come out alive." (Compl., ¶70). Plaintiff also alleges that "[a]s a proximate result of the Defendants' intentional conduct, willful and wanton conduct, and/or negligence, as alleged herein above, Helvenston, Teague, Zovko and Batalona . . . were killed March 31, 2004."

In support of the fraud claim, plaintiff alleges that defendants represented that the decedents would receive protections guaranteed by the primary contract, which induced the decedents to enter into the Independent Contractor Service Agreements. Plaintiff further alleges that when defendants made these representations they knew that they were false and concealed true facts with the intent to induce the decedents to enter into the Independent Contractor Service Agreements.

Plaintiff seeks compensatory damages for wrongful death of the decedents, recision of the Independent Contractor Service Agreements, as well as punitive damages from each defendant, including damages for "mental anguish, fear and terror of being forced to travel into the center of Fallujah . . . and the physical pain and suffering of being shot, beaten, burned, tortured and dismembered." (Compl., ¶93).

## DISCUSSION

### I. Removal Jurisdiction

The party seeking removal has the burden of establishing federal jurisdiction. Mulcahey v. Columbia Organic Chems. Co., 29 F.3d 148, 151 (4th Cir. 1994). The court must strictly construe

removal jurisdiction, and resolve all doubts in favor of remand. Id. The right to remove a case from state to federal court derives solely from 28 U.S.C. § 1441, which provides in relevant part:

> [A]ny civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a). In this case, there is no allegation of diversity of citizenship between the parties. Accordingly, the propriety of removal depends on whether the suit raises a federal question, that is, whether it is an action "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

Ordinarily, under the "well-pleaded complaint" rule, a suit raises a federal question "only when the plaintiff's statement of his own cause of action shows that it is based" on federal law. Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152 (1908). A defense is not part of a plaintiff's properly pleaded statement of his claim. Rivet v. Regions Bank, 522 U.S. 470, 475 (1998). Therefore, "a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption." Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 14 (1983).

A limited exception to the well-pleaded complaint rule exists where the state law claim has been "completely preempted" by federal law. Beneficial National Bank v. Anderson, 539 U.S. 1, 7, 8 (2003); Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64 (1987). In such a case, even a complaint that only purports to raise a state law claim may be removed to federal court because it necessarily raises a federal question. See Beneficial National Bank, 539 U.S. at 7-8; 10; Franchise Tax Bd., 463 U.S. at 22.

Here, defendants do not dispute that plaintiff's complaint raises only state law causes of action. Defendants argue, however, that the statutory and regulatory scheme of the DBA completely preempts plaintiff's state law claims. In the alternative, defendants argue that this lawsuit concerns a "unique federal interest" in the remedies available to individuals working in support of national defense or war-zone efforts. The court will address each argument in turn.

### A. Complete Preemption

A federal statute completely preempts a state law claim if it "provide[s] the exclusive cause of action for the claim asserted" and "set[s] forth procedures and remedies governing that cause of action." Beneficial National Bank, 539 U.S. at 8. To have complete preemption, not only must the state law claim come "within the scope of the federal cause of action" created in the statute, Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987), but also Congress must have manifested an intent to make the federal cause of action "exclusive." Beneficial National Bank, 539 U.S. at 9, n.5; see Metropolitan Life, 481 U.S. at 66-67 (holding that state law claims which fall within the scope of the federal civil enforcement provision of ERISA were completely pre-empted); Franchise Tax Bd., 463 U.S. 1, 23-24 (noting that state law claims which fall within the scope of the provision describing federal court procedures and remedies for suits under the LMRA were completely pre-empted); Rosciszewski v. Arete Assocs., 1 F.3d 225, 232 (4th Cir. 1993) (holding that the "grant of exclusive jurisdiction to the federal district courts over civil actions arising under the Copyright Act, combined with the preemptive force of § 301(a) [of the Copyright Act], compels the conclusion that Congress intended" to preempt state law actions).

The Fourth Circuit recently held that there is a "presumption" against complete preemption, and that defendants' burden "is to demonstrate that a federal statute indisputably displaces any state

cause of action over a given subject matter." Lontz v. Tharp, 413 F.3d 435, 440 (4th Cir. 2005). Specifically, "the congressional intent that the state law be entirely displaced must be clear in the text of the statute." Id. at 441 (citing Metropolitan Life, 481 U.S. at 65-66). Reviewing Supreme Court precedent, the court further affirmed that "the *sine qua non* of complete preemption is a pre-existing federal cause of action that can be brought in the district courts." Id. at 442. Accordingly, "Congress's allocation of authority to an agency and away from district courts defeats a complete preemption claim." Id. at 443.

With these principles in mind, the court turns to an analysis of whether the DBA completely preempts state law claims falling within its scope. The DBA is a federal statute that incorporates and extends the comprehensive worker's compensation scheme established by the Longshore and Harbor Worker's Compensation Act (LHWCA) to select forms of employment outside of the United States. Davila-Perez v. Lockheed Martin Corp., 202 F.3d 464, 468 (1st Cir. 2000). In relevant part, the DBA provides:

> Except as herein modified, the provisions of the [LHWCA] as amended, shall apply in respect to the injury or death of any employee engaged in any employment –
> \* \* \*
> under a contract entered into with the United States or any executive department, independent establishment, or agency thereof (including any corporate instrumentality of the United States), or any subcontract, or subordinate contract with respect to such contract, where such contract is to be performed outside the continental United States . . . for the purpose of engaging in public work . . . .

42 U.S.C. § 1651(a). By reference, the LHWCA provides for the exclusivity of remedy against a qualifying employer for injury or death:

> The liability of an employer prescribed in section 4 [33 U.S.C. § 904] shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone

9

> otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death . . . .

33 U.S.C. § 905(a). In addition to this LHWCA exclusion provision, the DBA expressly excludes liability to employers under "the workmen's compensation law of any state." 42 U.S.C. § 1651(c).

In place of recovery under state worker's compensation and tort law, the liability of an employer for the death of an employee under the DBA is limited to statutory death benefits. See 33 U.S.C. § 904(a) (referencing § 909, death benefits). These include funeral expenses and monthly payments set according to a statutory percentage rate of average wages of the decedent. See 33 U.S.C. § 909 (a)-(b).

The DBA provides a comprehensive federal framework for adjudication and administration of claims for statutory death benefits. Specifically, a claim must be filed with the United States Department of Labor:

> Except as otherwise provided in this section, the right to compensation for disability or death under this Act shall be barred unless a claim therefore is filed within one year after the injury or death. . . . Such claim shall be filed with the deputy commissioner [of the Department of Labor] in the compensation district in which such injury or death occurred.

33 U.S.C. 913(a). Jurisdiction over such claims is vested exclusively with United States Secretary of Labor:

> a claim for compensation may be filed with the deputy commissioner in accordance with regulations prescribed by the commission [Secretary of Labor] at any time after the first seven days of disability following any injury, or at any time after death, and the deputy commissioner shall have full power and authority to hear and determine all questions in respect of such claim.

33 U.S.C. § 919(a); see also § 939(a) (providing that the "Secretary [of Labor] shall administer the provisions of this Act.").