# EXHIBIT 6 PART 1

LEXSEE 2007 US APP LEXIS 9577

COMMUNITY STATE BANK, CASH AMERICA FINANCIAL SERVICES, INC., CASH AMERICA INTERNATIONAL, INC., GEORGIA CASH AMERICA, INC., DANIEL R. FEEHAN, Petitioners-Appellants, versus JAMES STRONG, Respondent-Appellee.

No. 06-11582

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

2007 U.S. App. LEXIS 9577

April 27, 2007, Decided
April 27, 2007, Filed

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the Northern District of Georgia. D. C. Docket No. 04-02608-CV-WSD-1. Advance Am., Cash Advance Ctrs. of Ga., Inc. v. King, 2006 U.S. Dist. LEXIS 7215 (N.D. Ga., Feb. 7, 2006)

**DISPOSITION:** REMANDED.

**JUDGES:** Before CARNES and MARCUS, Circuit Judges, and JORDAN, District Judge. * MARCUS, Circuit Judge, specially concurring, in which JORDAN, District Judge, joins.

* Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

**OPINION BY:** MARCUS

**OPINION:** MARCUS, Circuit Judge:

At issue today is whether the district court erred in dismissing, for lack of subject matter jurisdiction, the petition of a bank and its servicing affiliates to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4. After thorough review, we conclude that the district court did indeed have subject matter jurisdiction. Under the binding law of this circuit, a district court has federal question jurisdiction over a § 4 petition to compel arbitration if the underlying dispute to be arbitrated itself states a federal question. Because at least one of the claims petitioners seek to arbitrate states a federal question, the district court had federal question jurisdiction over the petition to compel [*2] arbitration. Accordingly, we reverse and remand to the district court for further proceedings consistent with this opinion.

**I. Background**

This action arises out of a "payday" loan -- a small, high-interest loan due to be repaid within a few weeks, usually on the borrower's next pay day. Many states, including Georgia, have various usury laws that generally prohibit such high-interest loans. Thus, no one doubts that when so-called "payday stores" extend loans directly to Georgia residents -- that is, without the involvement of any out-of-state bank -- they may not charge interest in excess of that permitted under Georgia law. However, Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. § 1831d ("DIDA"), codified as Section 27 of the Federal Depository Insurance Act ("FDIA") (hereinafter "Section 27"), expressly permits state-chartered, FDIC-insured banks to export the favorable interest rates of the state in which they are located to borrowers in other states, "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section." n1 Some states, such as South [*3] Dakota, place no limitation on the amount of interest such banks can charge. n2 Thus, none of the parties appears to doubt that when an FDIC-insured bank chartered in South Dakota extends loans directly to Georgia residents, it may charge whatever interest rates it wishes, notwithstanding Georgia law to the contrary.

n1 Section 27(a) provides, in relevant part:

> In order to prevent discrimination against State-chartered insured depository institutions...with respect to interest rates, if the applicable rate prescribed in this subsection

exceeds the rate such State bank...would be permitted to charge in the absence of this subsection, such State bank...may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section,...charge on any loan...interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank...or at the rate allowed by the laws of the State...where the bank is located, whichever may be greater.

n2 See S.D. Codified Laws § 54-3-1.1 (2006) (providing that the rate of interest is set by written agreement, with "no maximum interest rate...or usury rate restriction").

[*4]

The legal gray area occurs when such out-of-state banks "partner" with Georgia payday stores to extend loans to Georgians. Such partnerships have been the subject of much litigation, not only in Georgia, but in other states with usury laws. Generally speaking, the banks and the payday stores argue that the payday store merely markets, services, and collects local loans on behalf of the out-of-town bank, which, they say, is the true lender. As a result, they say, the loans are extended by the bank, and their high interest rates are protected by Section 27. Not surprisingly, borrowers, consumer advocacy groups, and some states argue to the contrary that this alleged agency relationship is a sham, and that the local payday stores, which do not enjoy the protection of Section 27, are the true lenders. Therefore, they conclude, the interest rates on the loans issued by the payday stores are governed by state law, under which they are usurious.

On February 6, 2004, respondent James E. Strong ("Strong"), a Georgia resident, visited one of seventeen payday stores owned and operated by petitioner Georgia Cash America, Inc., a Georgia corporation. Georgia Cash America is an affiliate of petitioners [*5] Cash America Financial Services, Inc., a Delaware corporation, and Cash America International, Inc., a Texas corporation. Petitioner Daniel Feehan is the Chief Executive Officer of all three Cash America entities (collectively, "Cash America"). According to petitioners, Cash America markets, services, and collects payday loans on behalf of petitioner Community State Bank ("the bank"), an FDIC-insured bank chartered by the state of South Dakota. Strong took out a loan for $ 200, which he promised to repay by March 3, 2004, along with a $ 36 "finance charge." As the promissory note he signed disclosed, the finance charge is the equivalent of an annual percentage rate of 252.692%. The note also stated that the contract involved interstate commerce and was subject to the Federal Arbitration Act ("FAA"), and that by signing, Strong acknowledged that "[a]ny controversy or claim" between himself and either the bank or Cash America "arising out of or in any way relating to" the loan "shall be settled by binding [individual] arbitration...with the sole exception of collection actions by [the bank]." Pet. Ex. B at 2. Finally, the note clearly identified the bank as the lender, and stated [*6] that Strong, by signing, acknowledged that the bank had contracted with Cash America to assist with the loan, but that Cash America was not "owned by, operated by, or affiliated with" the bank and had no authority to make or renew loans. Id.

Nevertheless, instead of repaying his loan, Strong commenced what he characterized as a class action lawsuit against Georgia Cash America, Cash America International, and Feehan ("state defendants") -- but not the bank or Cash America Financial Services -- in Georgia state court (the "state court action"). See Strong v. Ga. Cash Am., Inc., No. 2004A7104-6 (Ga. St. Ct.). n3 The state court complaint broadly asserted six causes of action arising under Georgia statutory and common law, n4 all essentially alleging that the loan is usurious and therefore unenforceable. Strong's theory, as alleged in his state court complaint, was that the bank had "little involvement" in the transaction "other than lending its name," that Cash America was thus the "de facto lender," and that Cash America's partnership with the bank was a "mere subterfuge" designed to allow Cash America to skirt Georgia's usury laws. Pet. Ex. A PP 25-26. The complaint also asserted [*7] that the arbitration provision was "unconscionable" and "unenforceable." Id. P 40. The state court complaint specifically averred that it did not raise any federal causes of action, including an action arising under the FDIA; did not state any cause of action against any bank; and did not seek recovery in excess of $ 75,000.

n3 The state court action is one of three nearly identical lawsuits filed in Georgia state court involving most of the same parties and counsel. See Strong v. Ga. Cash Am., Inc., No. 2004A7104-6 (State Ct. of Cobb County, Ga.); King v. Advance Am. Leasing Servs., Inc., No. 2004A7102-6 (State Ct. of Cobb County, Ga.); Strong v. First Am. Cash Advance of Ga., LLC, No. 04VS070349C (State Ct. of Fulton County, Ga.). All three state court actions bring state law claims against Georgia payday businesses and do not name the bank as a defendant. In each, the de-

fendants removed the case to the U.S. District Court for the Northern District of Georgia, alleging federal question and, in some cases, diversity jurisdiction; the three removed cases were deemed to be related and assigned to the same district judge. See Strong v. Ga. Cash Am., Inc., No. 04-2611 (N.D. Ga.); King v. Advance Am. Leasing Servs., Inc., No. 04-2618 (N.D. Ga.); Strong v. First Am. Cash Advance of Ga., LLC, No. 04-2610 (N.D. Ga.). In addition, the defendants in each state court action, together with the bank, initiated an independent civil action before the same district court judge seeking, under §§ 3 and 4 of the FAA, to compel arbitration and stay the proceedings of the companion removed state action. (In Advance America, petitioners also sought a declaration from the district court, under the Declaratory Judgment Act, 28 U.S.C. § 2201, that any disputes between the parties arising from the loan were subject to arbitration under the parties' agreement.) See Cmty. State Bank v. Strong, No. 04-2608 (N.D. Ga.); Advance Am. v. King, No. 04-2765 (N.D. Ga.); Cmty. State Bank v. Strong, No. 04-2609 (N.D. Ga.). Soon thereafter, the state court action plaintiff or plaintiffs sought to remand each of the removed cases and to dismiss each of the independent FAA actions for lack of subject matter jurisdiction. In an order entered on December 13, 2005, the district judge granted the motions to remand all three state court actions. In an additional order entered on February 7, 2006, the district court granted the motions to dismiss all three independent FAA petitions. It is the district court's dismissal of one of the independent FAA petitions, Cmty. State Bank v. Strong, No. 04-2608 (N.D. Ga.), that we review today.

[*8]

n4 Specifically, Strong alleged violations of the Georgia Industrial Loan Act, O.C.G.A. § 7-3-1, et seq.; the Georgia Usury Statute, O.C.G.A. § 7-4-2(a)(2); the Georgia Criminal Usury Statute, O.C.G.A. § 7-4-18(a); the Georgia Payday Lending Statute, O.C.G.A. § 16-17-1, et seq.; the Georgia Check Cashing Statute, O.C.G.A. § 7-1-700, et seq.; and the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") Act, O.C.G.A. § 16-14-1, et seq. Strong also brought conversion and conspiracy claims under Georgia common law.

In response, the state defendants (Georgia Cash America, Cash America International, and Feehan) -- along with the bank -- served Strong with a Notice of Intent to Arbitrate pursuant to the terms of the agreement. The letter referred to Strong's state lawsuit challenging the loan as void and unenforceable, and claimed that the loan was indeed lawful. Specifically, the letter said that contrary to Strong's allegations, [*9] the loan was made by the bank, not by Cash America, and thus that the legality of the interest was governed by Section 27 of the FDIA, not by Georgia usury law. The letter then demanded that Strong dismiss his state court lawsuit and participate in individual, binding arbitration. Strong, through counsel, responded that he believed the contract he entered into with Cash America was "unconscionable and unenforceable," and thus that he intended to pursue his class action suit in state court. Pet. Ex. D at 1.

On September 7, 2004, Strong's opponents took two actions in response. First, the state court defendants -- Georgia Cash America, Cash America International, and Feehan -- removed that action to the United States District Court for the Northern District of Georgia, basing removal jurisdiction on the theory that Section 27 completely preempts Strong's Georgia usury claims, and thus that Strong's state court complaint necessarily stated a federal question. See Strong v. Ga. Cash Am., Inc., No. 04-2611 (N.D. Ga.). Strong moved to remand for lack of subject matter jurisdiction, claiming that removal had been improvidently granted. While that motion was pending, the defendants moved, [*10] under the FAA, to stay the proceedings and compel arbitration of "the claims of Plaintiff James E. Strong." Strong opposed that motion and moved for expedited discovery as to the enforceability of the arbitration agreement. After hearing both sets of motions, the district court granted Strong's motion for remand, holding that Section 27 does not completely preempt Strong's Georgia usury claims against Cash America, and thus that Strong's state court complaint did not state a federal question and was not removable. n5

n5 Defendants in the related case of Strong v. First Am. Cash Advance of Ga., LLC, No. 04-2610 (N.D. Ga.), see supra note 3, appealed the district court's order remanding that case. This Court issued an order sua sponte dismissing the appeal for lack of appellate jurisdiction under 28 U.S.C. § 1447(c) and (d). See Strong v. First Am. Cash Advance of Ga., LLC, No. 06-10541 (11th Cir., Feb. 24, 2006). Whether the district court improperly remanded is not before us, and we express no opinion on that issue.

[*11]

Second, the state court defendants -- along with both the bank and Cash America Financial Services -- commenced the instant independent action in the same United States district court by filing a Verified Petition to Compel Arbitration and Stay Judicial Proceedings, under §§ 3 n6 and 4 n7 of the FAA. See Cmty. State Bank v. Strong, No. 04-2608 (N.D. Ga.). The petition alleges that the promissory note Strong signed includes an arbitration provision, under which all claims and disputes with respect to the loan must be individually resolved through binding arbitration; that Strong and the petitioners dispute "whether [the] loan...is governed by Section 27...as opposed to state law," Pet. at 1-2; that petitioners Community State Bank, Georgia Cash America, Cash America International, and Feehan demanded that Strong arbitrate all disputes arising out of the loan, but that Strong refused; and that Strong's refusal to arbitrate threatens petitioners with severe injury.

> n6 Petitioners brought a cause of action not only under § 4 of the FAA, but also under § 3 of the FAA, which provides that where a suit is brought "in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending...shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). Leaving aside the question of whether § 3 is even applicable in this case (since the suit the petitioners sought to stay -- Strong's state-court suit -- was pending not in the district court but in state court), we find that petitioners have waived review of the district court's dismissal of this cause of action. In their briefs, petitioners fail to put forth any argument why the district court erred in dismissing their § 3 cause of action, and in their Response to Strong's Suggestion of Mootness, petitioners similarly only insist that a live § 4 case exists without even mentioning their § 3 cause of action. A § 3 cause of action is distinct from a § 4 cause of action. This circuit's rule that federal question jurisdiction over a § 4 cause of action lies where the dispute to be arbitrated states a federal question is based on the jurisdictional language of § 4 itself, see infra Part II.A; the same language does not readily support a finding of federal question jurisdiction over a § 3 cause of action. We, therefore, conclude that the petitioners have abandoned the issue of whether the district court erred in dismissing their § 3 cause of action. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (stating that passing references to issues are insufficient to raise a claim for appeal, and such issues are deemed abandoned).

[*12]

> n7 Section 4 of the FAA provides:
>
> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement....The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement....If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof....If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

[*13]

The petition alleges federal question jurisdiction under 28 U.S.C. § 1331 n8, and, pursuant to the jurisdic-

tional requirements of § 4 of the FAA, n9 recites that "[s]ave for the Arbitration Provision, this Court would have jurisdiction under Title 28 of the United States Code in a civil action of the subject matter of a suit arising out of the controversy between the parties." Pet. P 8. The petition asserts that "[b]ased on the allegations currently set forth in the State Complaint, including allegations that the Cash America Petitioners violated the Georgia [RICO] statute, [Strong] is in a position, if he chose, to amend the State Complaint to allege violations against Petitioners of the federal [RICO] Act, 18 U.S.C. §§ 1961 et seq." Id. P 10. The petition also avers that the plaintiffs wish to arbitrate not only Strong's state-court claims, but also that "[i]n the arbitration demanded by this Petition, Petitioners will seek a declaration that the interest on [Strong's] Loan is governed by Section 27 and that the Loan is lawful." Id. P 11 (emphasis added).

n8 The petition also alleged that "[t]o the extent that this Court does not have federal question jurisdiction with respect to any party and/or any claim, this Court has supplemental jurisdiction with respect to such party and/or claim under 28 U.S.C. § 1367(a)." Pet. P 13.

[*14]

n9 See supra note 7.

Strong moved to dismiss this independent FAA petition for lack of subject matter jurisdiction. Characterizing the disputes petitioners seek to arbitrate as his own state-court claims, Strong argued that even if usury claims against state-chartered banks are completely preempted by federal law (although, he suggested, they are not), his state-court complaint did not raise any usury claims against any bank. Thus, he argued, his state-court claims do not state a federal question and thus do not provide the district court with subject matter jurisdiction over the instant petition to compel arbitration.

The district court agreed with Strong, and granted Strong's motion to dismiss the FAA petition to compel arbitration for lack of subject matter jurisdiction. The district court, too, characterized the claims to be arbitrated as those "asserted in the State-Court Action" and, reiterating the reasoning of its remand order in the parallel state court action, again held that Strong's state complaint did not state a federal question. Specifically, the court determined that Section 27 [*15] does not completely preempt Georgia law usury claims against state-chartered banks, and that even if it did, Strong's complaint stated no such claims against any bank.

Petitioners then timely filed the instant appeal.

## II. Subject Matter Jurisdiction

We review de novo a district court's grant of a motion to dismiss for lack of subject matter jurisdiction. Asociacion De Empleados Del Area Canalera v. Panama Canal Comm'n, 329 F.3d 1235, 1237-38 (11th Cir. 2003).

"In a given case, a federal district court must have at least one of three types of subject matter jurisdiction: (1) jurisdiction under a specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)." Baltin v. Alaron Trading Corp., 128 F.3d 1466, 1469 (11th Cir. 1997). Although petitioners' causes of action appear to arise under the FAA, it is by now well established that the FAA does not by itself confer subject matter jurisdiction upon the federal courts. Instead, some independent basis of subject matter jurisdiction is necessary. [*16] Id. The parties agree that diversity jurisdiction is lacking in this case. Thus, the only possible independent basis for finding subject matter jurisdiction is federal question jurisdiction.

A.

Tamiami Partners Ltd. ex rel. Tamiami Development Corp. v. Miccosukee Tribe of Indians of Florida, 177 F.3d 1212 (11th Cir. 1999) ("Tamiami III"), established the test in this circuit for determining federal question jurisdiction over a § 4 petition. Tamiami involved a complex dispute over an agreement between an Indian tribe and a developer to manage a bingo hall. The parties' agreement incorporated the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"), and its associated regulations, and provided that all disputes arising from the contract would be arbitrated. Nevertheless, the tribe claimed that the developer had repeatedly violated the agreement and announced that it considered the agreement to be terminated. The developer sued in federal district court, and its complaint came before this Court on three separate occasions. Only on the third try did we hold that it had successfully pled its claim.

In the first [*17] attempt, the developer alleged that the tribe could not unilaterally terminate the agreement without first arbitrating its complaints, and sought to compel such arbitration. We held that the developer merely stated an ordinary breach of contract claim, and we dismissed the claim for lack of federal question jurisdiction. Tamiami Partners, Ltd. v. Miccosukee Tribe, 999 F.2d 503, 508 (11th Cir. 1993) ("Tamiami I").

Meanwhile, the tribe had begun denying gaming licenses to the developer's employees. In the second attempt, the developer alleged that this was an abuse of the tribe's authority conferred upon it by IGRA, and as such constituted a breach of the parties' agreement and a viola-

tion of IGRA. We held that the developer had now pled facts giving rise to a federal question, but dismissed the claim because IGRA itself provided no right of relief for the developer, and the tribe had only waived its sovereign immunity with respect to actions to compel arbitration or confirm arbitration awards, not breach of contract actions. Tamiami Partners, Ltd. v. Miccosukee Tribe, 63 F.3d 1030, 1047 & n.61 (11th Cir. 1995) ("Tamiami II").

Finally, on its [*18] third attempt, the developer pled the same facts regarding the licensing dispute but sought a declaration that the licensing dispute was arbitrable, confirmation of an arbitration award concerning part of that dispute, and compelled arbitration of still other aspects of the licensing dispute. The Tamiami III panel noted that

> these very same claims were before this court in Tamiami II, albeit in the context of a direct breach of contract suit against the Tribe. The Tamiami II panel concluded that these claims arose under federal law because the Agreement incorporated -- by operation of law if not by reference -- the provisions of IGRA and its associated regulations regarding licensing procedures.

Tamiami III, 177 F.3d at 1222-23. The panel concluded that "federal law is equally implicated when these claims are presented in the arbitration context," and added the following critical footnote:

> The Federal Arbitration Act empowers a district court to issue an order compelling arbitration if the court, "save for [the arbitration] agreement, would have jurisdiction under title 28, in a civil action...of the subject matter of a suit arising [*19] out of the controversy between the parties." 9 U.S.C. § 4 (1994). Thus, it is appropriate for us to "look through" Tamiami's arbitration request at the underlying licensing dispute in order to determine whether Tamiami's complaint states a federal question.

Id. at 1223 n.11 (alteration and omission in original). The Tamiami III panel then held that the developer's second amended complaint stated a federal question. Id. at 1223.

We read Tamiami III as holding that § 4 directs a district court to take subject matter jurisdiction over a § 4 petition if it would have subject matter jurisdiction over the dispute-to-be-arbitrated. In that case, we concluded, on the basis of § 4, that it was appropriate for the district court to "look through" the § 4 arbitration petition at the underlying dispute in order to determine whether there was a federal question. Tamiami III is our only case to squarely address the question of whether federal question jurisdiction over a § 4 petition exists when the underlying dispute to be arbitrated states a federal question, and the Supreme Court has not squarely addressed the matter. [*20] As such, Tamiami III is binding on us. Therefore, the district court, in determining whether it had federal question jurisdiction over the instant § 4 petition, was right to cite Tamiami III and ask whether the underlying dispute to be arbitrated states a federal question.

B.

However, we think that the district court too easily assumed that the dispute petitioners seek to arbitrate is defined by Strong's state-court complaint. Petitioners are the "initiating parties" in the arbitration proceeding that they seek to initiate, and they are the plaintiffs in this independent action. We therefore look to petitioners' own statement of the dispute or disputes they wish to arbitrate, and in this, they are not limited to seeking compelled arbitration of claims that have been brought against them in court. Under the FAA, any party to such an agreement may seek to compel any dispute that falls within the scope of the agreement upon a showing that the other party has "fail[ed], neglect[ed], or refus[ed]" to participate in arbitration of it. 9 U.S.C. § 4. n10

> n10 Our opinion in First Franklin Financial Corp. v. McCollum, 144 F.3d 1362 (11th Cir. 1998) (per curiam), is instructive. There, a borrower, McCollum, had sued his bank, First Franklin, and one of its employees, Dingle, in state court, alleging that a loan he had taken out was fraudulent under state law. In McCollum's state action, complete diversity was lacking because McCollum and Dingle were both citizens of Alabama. However, the bank then by itself brought an independent § 4 petition in federal court seeking to compel arbitration of McCollum's claims. On appeal, McCollum challenged the district court's subject matter jurisdiction over the bank's § 4 petition, making two related arguments. First, McCollum argued "that diversity jurisdiction is lacking because the state-court action is not removable due to Dingle's Alabama citizenship." We rejected this argument:

> As a matter of both § 1332's language and common sense, whether another action is removable or not does not affect jurisdiction in this, an independent action. . . . The state-court action has three parties, but only two are parties to this action seeking an order compelling arbitration. It is perfectly consistent, therefore, for removal jurisdiction to lack in one, but subject matter jurisdiction to be present in the other.

Id. at 1363. Second, McCollum argued that a federal court has subject matter jurisdiction over a § 4 petition only if it would have subject matter jurisdiction over the "underlying dispute" to be arbitrated which, he suggested, was defined by his own state-court complaint. Again, we rejected this argument:

> The "underlying dispute" that 1st Franklin seeks to arbitrate is not McCollum's quarrel with 1st Franklin's codefendant Dingle, but McCollum's quarrel with 1st Franklin. Although 1st Franklin accuses McCollum of suing Dingle just to defeat removal, for present purposes we assume that McCollum honestly believes that Dingle is for some reason independently liable to McCollum. So there are two "underlying disputes," McCollum v. Dingle and McCollum v. 1st Franklin, even though both may arise from the same transaction. 1st Franklin seeks to arbitrate only McCollum v. 1st Franklin, and there is undoubtedly diversity in that underlying dispute. There is, therefore, federal subject matter jurisdiction over the petition.

Id. at 1364.

[*21]

A careful reading of the instant petition reveals that petitioners seek to arbitrate two disputes: (1) Strong's state-court usury claims, see, e.g., Pet. at 13 (praying, inter alia, that "Respondent's claims proceed on an individual basis in arbitration"); and (2) petitioners' own affirmative claim that the loan is governed by Section 27 and is thus legal -- a claim for which they allege they plan to seek declaratory relief from the arbitrator, see id. P 11. If either of these two disputes-to-be-arbitrated states a federal question, the district court has subject matter jurisdiction over the petition to compel. The district court examined only the first of these disputes and held that because Strong's usury claims against the payday affiliates were not completely preempted by Section 27, they did not arise under federal law. We need not, and thus do not, address whether the district court erred in reaching this conclusion because, as we explain below, the second dispute-to-be-arbitrated -- petitioners' declaratory judgment claim -- does arise under federal law. n11

> n11 Determining whether Strong's usury claims are completely preempted by Section 27 and thus arise under federal law requires answers to complex, fact-bound questions involving the relationship between Section 27 and Georgia usury law, the nature of the agency relationship between the bank and the payday stores in this case, and how both Section 27 and Georgia usury law apply to that particular agency relationship. We need not grapple with them because petitioners' prayer for declaratory relief plainly arises under federal law.

[*22]

C.

Petitioners state in their petition that, among other things, "[i]n the arbitration demanded by this Petition, Petitioners will seek a declaration that the interest on [Strong's] Loan is governed by Section 27 and that the Loan is lawful." Pet. P 11. Under Tamiami III, we must "look through" the petition to compel arbitration and instead ask: If petitioners had brought this dispute in federal district court as a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201 n12, would it have arisen under federal law?

> n12 The Declaratory Judgment Act provides, in relevant part:
>
> > (a) In a case of actual controversy within its jurisdiction,...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

[*23]

We established the test for determining whether a claim under the Declaratory Judgment Act arises under federal law in Household Bank v. JFS Group, 320 F.3d 1249 (11th Cir. 2003). There, we noted that "[t]he operation of the Declaratory Judgment Act is procedural only." Id. at 1253 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S. Ct. 461, 81 L. Ed. 617 (1937)). Thus, a plaintiff may not bring a declaratory judgment action in federal court alleging subject matter jurisdiction under § 1331 merely by citing the Act itself, or even by virtue of the fact that he seeks a declaration of his rights and obligations under some federal law. Instead, we held that "federal-question jurisdiction exists in a declaratory judgment action if the plaintiff has alleged facts in a well-pleaded complaint which demonstrate that the defendant could file a coercive action arising under federal law." Id. at 1251. Thus, the jurisdictional question before us now becomes this: Do petitioners allege facts in a well-pleaded complaint which demonstrate that Strong could file a coercive action against them arising under federal law? We conclude that the [*24] answer is yes.

Petitioners allege that "[b]ased on the allegations currently set forth in the State Complaint, including allegations that the Cash America Petitioners violated the Georgia Racketeer Influenced and Corrupt Organizations statute, State Complaint at 87-96, [Strong] is in a position, if he chose, to amend the State Complaint to allege violations against Petitioners of the federal Racketeer Influenced and Corrupt Organizations Act." Pet. P 10. We agree. n13

n13 Petitioners argued below, and press on appeal, a slightly different argument with respect to the potential federal RICO claim they allege Strong could bring against them. Petitioners ask us to hold that Household Bank applies directly to FAA actions, such that a district court has federal question jurisdiction over a § 4 petition if the FAA defendant could bring a coercive action arising under federal law against the FAA petitioner. We need not address this alternative ground for subject matter jurisdiction and do not do so today.

[*25]

Petitioners correctly note that an action under the Georgia RICO statute, O.C.G.A. § 16-14-1 et seq., and one under the federal RICO statute, 18 U.S.C. § 1961 et seq., are "essentially the same." The Georgia Act imposes civil liability on those who, "through a pattern of racketeering activity...maintain...any interest in or control of any enterprise," or "participate in...such enterprise" through employment or association, or who conspire to do the same. O.C.G.A. § 16-14-4(a)-(c). n14 "'Enterprise' means any person,...corporation,...or other legal entity; or any...association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities." Id. § 16-14-3(6). "'Racketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under [various] laws of [Georgia]," including "Code Section 16-17-2, relating to payday loans." Id. § 16-14-3(9)(A)(xxxviii). The payday statute, in turn, makes [*26] it unlawful to charge, on a loan of less than $ 3,000, an interest rate exceeding 16% per annum. Id. § 16-17-2(a)(1)(G). "'Pattern of racketeering activity' means:...Engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission..., provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years...after the commission of a prior act of racketeering activity." Id. § 16-14-3(8)(A).

n14 The substantive section of the Georgia RICO statute provides, in relevant part:

(a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

(b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

> (c) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.

O.C.G.A. § 16-14-4.

[*27]

In his state court complaint, Strong alleged that the payday lenders comprised a "criminal enterprise" that targeted a common victim -- namely, "Georgia's most vulnerable and desperate consumers." Pet. Ex. A PP 91, 94. He alleged that they violated the Georgia RICO statute through "a pattern of racketeering activity that included...numerous acts of usury" and through conspiracy to do the same. Id. n15 PP 92, 89. Finally, Strong alleged that he was charged the equivalent of an annual percentage rate of 252.692% on his loan. Id. P 33.

> n15 Strong also alleged that the payday lenders committed the predicate act of theft by taking, deception and conversion. Pet. Ex. A P 92; see also O.C.G.A. § 16-14-3(9)(A)(ix) (making theft by taking, deception or conversion predicate acts under the Georgia RICO statute).

The same allegations could easily serve as the basis for a claim alleging a violation of the federal RICO statute. Like the Georgia RICO statute, the federal RICO statute [*28] imposes civil liability n16 upon those who, "through collection of an unlawful debt...maintain...any interest in or control of any enterprise which is engaged in...interstate...commerce," or "participate...in the conduct of such enterprise" through employment or association, or who conspire to do the same. 18 U.S.C. § 1962. n17 Like the Georgia act, the federal act defines an "enterprise" as "any individual,...corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. § 1961(4). Unlawful debt is defined as "a debt (A)...which is unenforceable under State...law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with...the business of lending money...at a rate usurious under State...law, where the usurious rate is at least twice the enforceable rate." Id. § 1961(6). As noted above, Strong alleges that under the Georgia payday statute his loan is unenforceable owing to its usurious rate of interest. And the loan's annual interest rate of 252.692% far exceeds "twice the enforceable rate" of 16% under [*29] Georgia law. n18

> n16 See 18 U.S.C. § 1964(c) ("Any person injured in his...property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....").

> n17 The substantive section of the Federal RICO statute includes, in relevant part, the following language:
>
>> (a) It shall be unlawful for any person who has received any income derived... through collection of an unlawful debt in which such person has participated as a principal..., to use or invest...any part of such income...in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate...commerce...
>>
>> (b) It shall be unlawful for any person...through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>>
>> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through...collection of unlawful debt.
>>
>> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.
>
> 18 U.S.C. § 1962.

[*30]

n18 In setting out the potential federal RICO claim Strong could bring against petitioners, we of course express no opinion on the merits of such a claim. Nor do we express any opinion on the merits of the state RICO claim he has already brought.

Strong does not deny that the facts he alleges in his complaint in support of a Georgia RICO claim could also support a federal RICO claim. Instead, he argues that at the time they filed the instant petition, the petitioners were not threatened by the possibility that Strong could bring a federal RICO action because he had already brought a coercive action against (some of) the petitioners (his state-court complaint) in which he "expressly disavowed any federal claims that he could assert." Reply Br. at 10-11 (citing State Complaint P 14). Strong says this fact distinguishes the instant case from Household Bank and the out-of-circuit cases that Household Bank cites, where no coercive action at all had been brought by the declaratory judgment defendants. "Here," he says, "there is no[] threat of litigation or fear of the unknown. [Strong] [*31] has filed his suit against the Payday Lenders (not CSB) alleging only state law claims (not federal claims)." Id. at 13. Again, we are unpersuaded.

Household Bank involved short-term loans issued by a bank at the request of a tax preparation service for its customers to cover the amount of the customer's anticipated tax refund. Some loan recipients initiated a class action lawsuit against the bank in the United States District Court for the Northern District of Illinois, alleging both federal and state claims. That lawsuit eventually settled. Over 600 Alabama loan recipients, however, had chosen to opt out of the class action suit. In short order, some of them threatened in an affidavit that if a similar settlement were not reached with the bank, they would "pursue litigation through the Courts here in Alabama which are favorable to plaintiffs with valid causes of action such as these." Household Bank, 320 F.3d at 1252. In response, the bank and the tax preparation service filed an action in federal district court under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), against five groups of potential Alabama plaintiffs seeking [*32] a declaration that the arbitration provisions in the loan agreements were enforceable. They argued that the district court had federal question jurisdiction over their declaratory judgment action because at the time they filed that action, the defendant borrowers "could have filed a non-frivolous coercive action in federal court under [the federal Truth in Lending Act], the National Bank Act, or RICO." Household Bank, 320 F.3d at 1252.

We agreed, and held that "a federal district court has subject-matter jurisdiction over a declaratory judgment action if, as here, a plaintiff's well-pleaded complaint alleges facts demonstrating the defendant could file a coercive action arising under federal law." Id. at 1259. The district court in that case had held that federal question jurisdiction was lacking, reasoning that

> if a declaratory judgment plaintiff may seek relief in federal court based on the fact that the declaratory judgment defendant may assert a federal claim, even though he may also limit his coercive action to only state claims, that is tantamount to allowing a declaratory judgment plaintiff to force the other party to litigate [*33] a claim that he may have no intention of pursuing.

Id. at 1254 (quoting Household Bank v. JFS Group, 191 F. Supp. 2d 1292, 1303 (M.D. Ala. 2002)). For better or worse, we responded, the Declaratory Judgment Act allows declaratory judgment plaintiffs to do just that. "Concerns that permitting a party to seek a declaration under the [Declaratory Judgment Act] where the defendant could file a coercive action under state or federal law eviscerates the principle that [the] plaintiff is the master of his or her claim, must be addressed to the legislative branch of our Government." Id. at 1258 (emphasis in original).

Finally, we addressed the defendant borrowers' argument, similar to Strong's here, that they had informed the district court that they did not intend to file a federal claim against the bank or the tax preparation service, and that after the instant declaratory judgment action was filed, some defendants had in fact filed non-federal claims in state court. We held that "[i]n determining whether a district court has subject-matter jurisdiction, we must look to the facts as they existed at the time the action was filed, [*34] " id. at 1259, and as of that time (and, indeed, up to the time of our appellate decision), "[t]he Alabama Defendants ha[d] not entered into a settlement agreement or filed a release of their federal claims in this matter, nor [ha]d they request[ed] the district court to enter judgment against them. Regardless of their present renunciation, without a binding, judicially enforceable agreement, the Alabama Defendants could still put [the bank] and [the tax preparation service] to the task of defending against the non-frivolous federal law claims alleged in this declaratory judgment action." Id. at 1260 (emphasis added).

On August 6, 2004, Strong filed suit in state court against the payday lenders. His complaint included a state RICO claim, but emphasized that it did not include any federal claims. On September 9, the state-court payday defendants removed that action to federal court. On the same day, the payday defendants and the bank joined in filing the instant FAA petition.

Strong plainly made a strategic decision not to bring any federal claims against the state-court defendants in an attempt to prevent his lawsuit from being removed to federal court. That [*35] Strong chose not to bring a federal RICO action, however, does not mean that he "could" not have done so. Without "a binding, judicially enforceable agreement," Strong could still have put petitioners to the task of defending against a non-frivolous federal RICO claim. Indeed, on the same day that petitioners filed the instant petition, the state-court defendants removed Strong's action to federal court, and had they succeeded (Strong would not move to remand for another week, and the district court would not grant that motion for another three months), Strong would no longer have had any reason not to amend his complaint to add a federal RICO claim. We have previously held that the fact that a plaintiff "chose to initiate the action in state court without [federal] claims" is not a "substantial reason" under Rule 15 of the Federal Rules of Civil Procedure for denying leave to amend the complaint to add federal claims once the defendant has succeeded in removing the state-law case to federal court, and that the plaintiff will not be "bound by that choice." Halliburton & Assocs., Inc. v. Henderson, Few & Co., 774 F.2d 441, 443 (11th Cir. 1985) [*36] (affirming district court's denial of leave to amend on other grounds). n19 As we explained, the plaintiff's "choice of a state court forum was defeated by the removal. Once [the plaintiff] found itself in federal court, it may well have decided a different litigation strategy was in order." Id.

n19 As we explained in Halliburton:

> Federal Rule of Civil Procedure 15 provides that a party seeking to amend its complaint more than twenty days after service must seek leave of the court or written consent of the adverse party. The rule also states that "leave shall be freely given when justice so requires." Although the decision whether to grant leave is within the discretion of the district court, the rule contemplates that leave shall be granted unless there is a substantial reason to deny it. Espey v. Wainwright, 734 F.2d 748 (11th Cir. 1984). Permission may be denied where leave would cause undue delay or prejudice to the opposing party, where prior amendments have failed to cure deficiencies, or if the motive of the amendment is dilatory. Id. at 750; see also Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618 (11th Cir. 1983).

[*37]

Kidder, Peabody & Company, Inc. v. Maxus Energy Corp., 925 F.2d 556 (2d Cir. 1991), which we discussed at some length and with approval in Household Bank, see 320 F.3d at 1259-60, presented a fact pattern similar to the one we confront in this case. There, the declaratory judgment defendant, Maxus, had threatened to bring various claims, including one federal claim, against the plaintiff, Kidder. However, Maxus then filed an action in state court bringing only state-law claims. 925 F.2d at 559, 562. Two hours later, Kidder filed a declaratory judgment action in federal district court, alleging federal question jurisdiction on the ground that Maxus could bring a federal claim against it. Id. at 559. Maxus moved to dismiss for lack of subject matter jurisdiction and mootness, representing to the district court that it would never bring any such federal claim against Kidder. Id. at 560, 562-63. The Second Circuit rejected that argument:

> A controversy ceases to be "real and immediate" when "the issues presented are no longer 'live' or when the parties lack a legally cognizable interest in the [*38] outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969) . . . . This is not a case where the parties have entered into a settlement, or where the defendant has entered into a binding, judicially enforceable agreement. In those situations, the claims inarguably were moot. By contrast, Maxus attempts to unilaterally bar Kidder's claims for declaratory relief simply by representing that it will not bring an action under the federal securities laws. Without a declaratory judgment, Maxus again could put Kidder to the task of defending against the federal securities claims. A judicial declaration that Maxus

is barred from asserting the [federal claims] would both settle the matter between these parties once and for all and dispel all uncertainty regarding the liability of Kidder for these claims.

Id. at 563 (emphasis added, citations and quotation marks omitted). The situation is similar here. Neither the fact that Strong brought a suit asserting only state-law claims nor the fact that he has since represented that he will not amend that complaint to add federal claims prohibits Strong from changing his mind.

Because [*39] petitioners' § 4 FAA arbitration petition alleges facts which demonstrate that Strong could file a federal RICO claim against them, under Household Bank, the district court would have federal question jurisdiction over a declaratory judgment action by petitioners that the loan is lawful and its interest rate is governed by Section 27. And because one of the underlying disputes to be arbitrated plainly includes this declaratory judgment action, and because when we "look through" under Tamiami III that action arises under federal law, the district court had federal question jurisdiction over petitioners' action to compel arbitration. Since the claims-to-be-arbitrated that are reflected in Strong's usury complaint "arise out of a common nucleus of operative fact with" the declaratory judgment claim, they "form part of the same case or controversy under Article III of the United States Constitution" and we easily find that the district court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a). n20 See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966); Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 742-43 (11th Cir. 2006). [*40]

> n20 Section 1367(a) provides, in relevant part:
>
> > [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

### III. Conclusion

The district court's judgment dismissing the petition for lack of subject matter jurisdiction is reversed and remanded for further proceedings. On remand, the district court should enforce the parties' agreement to arbitrate if and when the court satisfies itself "that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. n21

> n21 Just over one week before oral argument in this appeal, Strong filed with us a Suggestion of Mootness, arguing that the petition to compel arbitration is moot as to all petitioners and should be dismissed. As to the payday petitioners, Strong argues that a sanction imposed against the state court payday defendants by the Georgia trial court prevents the payday petitioners in this action from succeeding on their petition to compel arbitration. While the instant FAA petition had been pending in federal district court, the state court payday defendants' motion to stay the state court proceedings and compel arbitration had been pending before the state court after remand. The state trial court apparently ordered the parties to conduct discovery on the factual issues relating to whether the arbitration agreement was subject to the defenses of "fraud in the factum" and procedural unconscionability. On October 11, 2006, the state court found that defendants wilfully failed to timely produce documents that were requested by Strong and ordered to be produced by the court, and, as sanction, struck defendants' arbitration defenses alleged in their answer. Strong then filed his Suggestion of Mootness, arguing that the state trial court's order (which Strong attached) striking the defense of arbitration "mooted" the payday petitioners' "ability to compel arbitration in a state or federal forum against...Strong." Suggestion of Mootness at 3.
>
> Strong cites no case and offers no legal theory for this conclusion. Certainly the law of former adjudication will not help him. In considering whether to give preclusive effect to state court judgments under the doctrines of res judicata (or claim preclusion) or collateral estoppel (or issue preclusion), we apply that state's law of preclusion. See Kizzire v. Baptist Health Sys., Inc., 441 F.3d 1306, 1308 (11th Cir. 2006) (res judicata); Agripost, Inc. v. Miami-Dade County, ex rel. Manager, 195 F.3d 1225, 1229 n.7 (11th Cir. 1999) (collateral estoppel). Under Georgia law, for a claim to be barred under the doctrine of

res judicata, the following elements must be met: "(1) identity of the cause of action, (2) identity of the parties or their privies, and (3) previous adjudication on the merits by a court of competent jurisdiction." Karan, Inc. v. Auto-Owners Ins. Co., 280 Ga. 545, 629 S.E.2d 260, 262 (Ga. 2006). The doctrine of collateral estoppel "precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies." Id. at 262. Even assuming that the state court's sanction of striking portions of the payday defendants' pleading operates as an adjudication on the merits for purposes of preclusion, see, e.g., Brantley v. Sparks, 167 Ga. App. 323, 306 S.E.2d 337, 338 (Ga. App. 1983) (sanction of dismissal after finding of willful violation of discovery order operates as an adjudication on the merits), a further requirement of both res judicata and collateral estoppel under Georgia law is that the prior adjudication be final. "It is the general rule that a judgment sought to be used as a basis for the application of the doctrine of res judicata (or collateral estoppel) must be a final judgment. In Georgia a judgment is suspended when an appeal is entered within the time allowed. And the judgment is not final as long as there is a right to appellate review." CS-Lakeview At Gwinnett, Inc. v. Retail Dev. Partners, 268 Ga. App. 480, 602 S.E.2d 140, 142 (Ga. App. 2004) (quoting Greene v. Transport Ins. Co., 169 Ga. App. 504, 313 S.E.2d 761, 763 (Ga. App. 1984)); see also O.C.G.A. § 9-12-19 ("Where a judgment is entered and, within the time allowed for entering an appeal, an appeal is entered, the judgment shall be suspended."); Mayor & Alderman of City of Forsyth v. Monroe County, 260 Ga. 296, 392 S.E.2d 865, 866 (Ga. 1990) (doctrine of estoppel by judgment did not preclude federal court from holding that state statute was unconstitutional even though state court had previously held statute to be constitutional where state court judgment was being appealed at time of federal court judgment). In response to Strong's Suggestion of Mootness, the payday lenders stated that their time for appeal has not expired and that they intend to appeal the Georgia trial court's sanction. Strong has not contradicted this claim, nor is there any indication in the record before us that the state-court suit is final, as required under Georgia law before a judgment can have any preclusive effect. As a result, the instant case is not moot as to the payday lenders.

As for the bank, Strong argues for the first time that the bank cannot compel arbitration of Strong's state-court claims because the bank is not a party to that suit, nor has Strong brought any other claims against the bank. However, the fact that the bank is not a named party in any particular lawsuit is irrelevant; the bank plainly is a party to the arbitration agreement included in the loan contract. See Commercial Metals Co. v. Balfour, Guthrie, & Co., 577 F.2d 264, 266 (5th Cir. 1978) (the right to compel arbitration derives from the parties' agreement to arbitrate). As we have explained in Part II.B, supra, under the FAA, all that is required for one party to an arbitration agreement to compel another party to arbitrate a dispute is the "alleged failure, neglect, or refusal" of the latter to arbitrate that dispute. 9 U.S.C. § 4. Such failure to arbitrate need not manifest itself in the form of a lawsuit; it is enough that one party has demonstrated an unwillingness to arbitrate a dispute within the scope of the arbitration agreement. Here, Strong filed a lawsuit claiming that the interest rate is invalid. The bank, along with other "initiating parties," sent Strong's counsel a Notice of Intent to Arbitrate disputing Strong's claims and demanding that he participate in arbitration of all disputes arising from the loan. Strong responded that he believed that the loan contract to be "unconscionable and unenforceable." This is more than sufficient to show that Strong and the bank have an active dispute, and that Strong is unwilling to abide by their arbitration provision, given his belief that the entire contract is unenforceable.

[*41]

**REVERSED AND REMANDED.**

**CONCUR BY:** MARCUS

**CONCUR:** MARCUS, Circuit Judge, specially concurring, in which JORDAN, District Judge, joins:

As should be clear from the majority opinion, I concur in the judgment and in all other aspects of our opinion in this case. I do so because I believe that we are bound by Tamiami Partners Ltd. ex rel. Tamiami Development Corp. v. Miccosukee Tribe of Indians of Florida, 177 F.3d 1212 (11th Cir. 1999) ("Tamiami III"), which held that the text of § 4 of the FAA, 9 U.S.C. § 4, requires a district court, in determining whether it has federal question jurisdiction over a § 4 arbitration claim, to "look through" that claim and instead ask whether the underlying dispute the petitioner seeks to arbitrate states a federal question. n1 I write separately to explain why I believe this holding is wrong, or at the very least ill-considered, and why the important, indeed basic, juris-

dictional question embodied both in Tamiami III and in this case is ripe for en banc review by this Court or certiorari review by the Supreme Court. n2

n1 Section 4 of the FAA provides, in relevant part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement...

9 U.S.C. § 4.
[*42]

n2 While I object to the rule announced in footnote 11 of Tamiami III, I hasten to add that I do not quarrel, for several reasons, with the outcome of that case, in which we held that the complaint stated a federal question. Tamiami III was a complex case, before us for the third time, involving Indian land and tribal court power over non-Indians. Federal questions thus lurked around every corner of that case. See also notes 11 and 12, infra.

As more than one court of appeals has noted, the "clear weight of authority" is that § 4 does not make federal question jurisdiction over a petition to compel arbitration dependent on the nature of the underlying dispute to be arbitrated. See, e.g., Kasap v. Folger Nolan Fleming & Douglas, Inc., 334 U.S. App. D.C. 280, 166 F.3d 1243, 1246 (D.C. Cir. 1999) (noting as much but not reaching the issue itself); see also U.S. Bank Nat'l Ass'n ND v. Strand, 243 F. Supp. 2d 1139, 1141-45 (D. Or. 2002) (following the "great weight of authority" in holding irrelevant the federal nature of the underlying claim to be arbitrated). [*43]

Indeed, Tamiami III's stance puts this Court squarely at odds with at least four of our sister circuits, and aligns us with just one other circuit. Compare Westmoreland Capital Corp. v. Findlay, 100 F.3d 263, 267-69 (2d Cir. 1996) ("[T]he text of FAA § 4 should not be interpreted to mean that a federal court has subject matter jurisdiction over an action to compel or stay arbitration merely because the underlying claim raises a federal question. A petition under FAA § 4 to compel or stay arbitration must be brought in state court unless some other basis for federal jurisdiction exists, such as diversity of citizenship or assertion of a claim in admiralty."); Prudential-Bache Sec., Inc. v. Fitch, 966 F.2d 981, 986-88 (5th Cir. 1992) (holding, in response to an argument that § 4 directs the federal courts to take federal question jurisdiction over a § 4 petition based on the federal nature of the dispute to be arbitrated, that "when we read the [FAA] in light of its history and purpose and in conjunction with well established rules for determining federal question jurisdiction, we find that interpretation unpersuasive"); Smith Barney, Inc. v. Sarver, 108 F.3d 92, 94 (6th Cir. 1997) [*44] ("Our cases have made clear...that the Federal Arbitration Act does not supply an independent basis for federal jurisdiction, nor does the federal nature of the underlying claims that were submitted to arbitration. The rights asserted by Smith Barney in this case are based simply on an interpretation of the contract to arbitrate, as opposed to the actual merits of the underlying substantive claims." (citations omitted)); and Wisconsin v. Ho-Chunk Nation, 463 F.3d 655, 659 (7th Cir. 2006) ("[T]his circuit has recognized that [a] strong body of caselaw has developed...holding that the nature of the underlying dispute [in arbitration] is irrelevant for purposes of subject matter jurisdiction, even on a motion to compel [arbitration]...[T]he motion itself must involve diversity or federal question jurisdiction. Thus, we do not look to the Nation's underlying complaint in arbitration, but confine our analysis to the federal claims articulated in Wisconsin's complaint before the district court." (citations and quotation marks omitted, first and last alterations added)), with Discover Bank v. Vaden, 396 F.3d 366, 373 (4th Cir. 2005) ("A federal [*45] court may...hear a § 4 petition to compel arbitration if, but for the arbitration agreement, subject matter jurisdiction over the case would otherwise exist by virtue of a properly invoked federal question in the underlying dispute.").

Moreover, this issue on which the circuits are plainly split is an important one. Actions are regularly filed under the FAA, and the approach adopted by our Court in Tamiami III and by the Fourth Circuit in Vaden, which finds federal question jurisdiction to compel arbitration whenever the dispute before the arbitrator raises a federal question even though the federal court itself is asked only to enforce a private contract, considerably expands federal court jurisdiction. At the very least, this important issue merits more consideration than we were able to give it in Tamiami III, where we were confronted, for the third time, with a multi-count complaint present-

ing an array of complex issues including many that were federal in nature.

In urging reconsideration of Tamiami III's holding, I stress three points. First, Tamiami III is in considerable tension with the Supreme Court's jurisprudence articulating the longstanding well-pleaded complaint [*46] rule. Second, Tamiami III is also in some tension with the path adopted in our own precedent applying the well-pleaded complaint rule to FAA actions. Third, while the text of § 4 is susceptible to more than one reasonable interpretation, I believe the better interpretation is that § 4 does not allow the federal courts to make an exception to the well-pleaded complaint rule and "look through" the claim embodied in the arbitration petition to the underlying dispute presented to the arbitrator for resolution. As I suggest below, Tamiami III's reading of § 4 produces a most unusual result: while the Supreme Court has made clear that the plain language of § 4 forbids federal district courts from adjudicating the merits of the dispute to be arbitrated and allows them to adjudicate only the arbitrability of the dispute by interpreting the parties' contract, and while the § 4 FAA petitioner's very purpose in going to federal district court is to have an arbitrator, rather than any court, resolve the underlying dispute to be arbitrated, Tamiami III interprets § 4 as nevertheless requiring the federal district courts to address the underlying dispute carefully enough to determine [*47] whether it states a federal question. Yet the federal district court does this, not so that it can resolve any of the parties' rights or remedies under federal law, but simply so that it can take subject matter jurisdiction of a § 4 FAA action that is often nothing more than an ordinary contract action.

### I. Tamiami III Is in Tension with the Well-Pleaded Complaint Rule

My first serious reservation with the rule that Tamiami III announces is that it is in considerable tension with the Supreme Court's case law construing what it means for a suit to "arise under" federal law for purposes of 28 U.S.C. § 1331, including those cases that establish the longstanding well-pleaded complaint rule. The Supreme Court has instructed us that the well-pleaded complaint rule requires the federal courts to find a federal question, if at all, only "from what necessarily appears in the plaintiff's statement of his own claim," Okla. Tax Comm'n v. Graham, 489 U.S. 838, 840-41, 109 S. Ct. 1519, 103 L. Ed. 2d 924 (1989), and not from any additional allegations that they did in fact plead, but which were not "necessary" to their cause of action. A straightforward [*48] application of that rule, I believe, yields the conclusion that the federal nature of the underlying dispute to be arbitrated is irrelevant in determining whether a § 4 cause of action filed in district court itself arises under federal law.

Nearly a century of Supreme Court case law developing the well-pleaded complaint rule requires a federal court to find federal question jurisdiction only where the necessary elements of the petitioner's cause of action present such a question, or where the determination of his suit depends on the resolution of a substantial question of federal law. See, e.g., Shulthis v. McDougal, 225 U.S. 561, 569, 32 S. Ct. 704, 56 L. Ed. 1205 (1912) (suit does not arise under federal law "unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of [federal] law, upon the determination of which the result depends"); Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983) (federal question jurisdiction exists only when the "well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's [*49] right to relief necessarily depends on resolution of a substantial question of federal law"); id. at 13 (where cause of action is not created by federal law, "federal jurisdiction is unavailable unless...some substantial, disputed question of federal law is a necessary element of...the well-pleaded state claim[]"); Okla.Tax Comm'n v. Graham, 489 U.S. 838, 840-41, 109 S. Ct. 1519, 103 L. Ed. 2d 924 (1989) ("[W]hether a case is one arising under [federal law]...must be determined from what necessarily appears in the plaintiff's statement of his own claim...unaided by anything alleged in anticipation o[r] avoidance of defenses ....").

When I consider the allegations that were essential to petitioners' § 4 cause of action in this case, I cannot find lurking in them any federal question. I reach this conclusion in three steps: first, although reference to the FAA necessarily appears in petitioners' statement, due to the "anomalous" nature of the FAA, this reference plainly is insufficient to confer federal jurisdiction over the petition; second, the remaining necessary elements of the instant FAA petition sound in contract and do not state a federal question; [*50] and, finally, the allegations found in the petition that do aver a federal question -- specifically, allegations concerning Section 27 and those embodied in the application for declaratory judgment -- are not part of a well-pleaded § 4 FAA petition but rather are wholly unnecessary, and thus under the well-pleaded complaint rule may not form the basis of federal question jurisdiction.

A.

First, as we noted in the majority opinion, although reference to the FAA necessarily appears in petitioners' statement, it is by now well-established that the FAA is an "anomaly in the field of federal-court jurisdiction," and the mere fact that petitioners bring an action under the FAA is by itself insufficient to confer federal jurisdiction over the petition. Moses H. Cone Mem'l Hosp. v.