# EXHIBIT B1

Dockets.Justia.com

## AMERICAN ARBITRATION ASSOCIATION

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

| | |
|---|---|
| BLACKWATER SECURITY CONSULTING, LLC, and BLACKWATER LODGE AND TRAINING CENTER, INC., )<br><br>Claimants,<br><br>v.<br><br>RICHARD P. NORDAN, as Ancillary Administrator for the separate Estates of Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko, and Wesley J.K. Batalona,<br><br>Respondent. | **Case No.: 50 181 T 00524 06**<br><br>**STATEMENT OF DEFENSE AND COUNTERCLAIM** |

## STATEMENT OF DEFENSE

1.      Respondent Richard P. Nordan, as Ancillary Administrator for the separate Estates of Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko, and Wesley J.K. Batalona, denies each and every claim and allegation of the Claimants' Demand for Arbitration, both generally and specifically, and further denies that Claimants are entitled to the relief requested in the Demand or to any other relief.

2.      Respondent denies that Claimants were damaged or injured in the manner or amounts alleged, or in any other manner or amounts whatsoever. Respondent further denies that he was  negligent, careless, reckless, wanton, acted unlawfully, breached any contract, acted wrongfully, or is liable, whether in the manner alleged, or otherwise.

1

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

3.      As a First and Separate Affirmative Defense, Respondent alleges that the Demand, and each purported claim alleged therein, fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Lack of Jurisdiction)

4.      As a Second and Separate Affirmative Defense, Respondent alleges that this arbitration tribunal, the International Centre for Dispute Resolution and/or the American Arbitration Association is without jurisdiction over this entire matter.

## THIRD AFFIRMATIVE DEFENSE

### (Statute of Limitations)

5.      As a Third and Separate Affirmative Defense, Respondent alleges that Claimants' Demand Complaint is barred in its entirety by the applicable statutes of limitations.

## FOURTH AFFIRMATIVE DEFENSE

### (Fraud)

6.      As a Fourth and Separate Affirmative Defense, Respondent alleges that the Claimants' Demand, and each claim alleged therein, is barred by the fraud, intentional misrepresentation, negligent misrepresentation, fraudulent concealment and/or fraudulent inducement by Claimants, their agents, attorneys, and/or representatives.

## FIFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

7.     As a Fifth and Separate Affirmative Defense, Respondent alleges that some or all of the purported claims in Claimants' Demand against Respondent are barred, in whole or in part, by the doctrine of unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

### (Estoppel)

8.     As a Sixth and Separate Affirmative Defense, Respondent alleges that the Claimants' Demand, and each claim alleged therein, is barred by the doctrine of estoppel because of the conduct of Claimants and their agents, attorneys, and/or representations upon which Respondent relied.

## SEVENTH AFFIRMATIVE DEFENSE

### (Waiver)

9.     As a Seventh and Separate Affirmative Defense, Respondent alleges that through Claimants' conduct and the conduct of their agents, attorneys, and/or representatives, Claimants have waived their rights, if any, to recover on the Claimants' Demand, or any claim alleged therein, including without limitation waiver of any alleged breach of contract or obligation.

## EIGHTH AFFIRMATIVE DEFENSE

### (Ratification And Waiver)

10.     As an Eighth and Separate Affirmative Defense, Respondent alleges that Claimants, on their own behalf and through the actions of their agents, attorneys, and/or representatives, authorized and/or ratified the actions of Respondent as alleged in the Claimants'

3

Demand, thereby waiving any and all claims against Respondent, if any, and Claimants can therefore not recover on its Demand or any claim alleged therein.

### NINTH AFFIRMATIVE DEFENSE

### (Consent)

11.     As a Ninth and Separate Affirmative Defense, Respondent asserts that Claimants consented to the acts and events set forth in the Claimants' Demand.

### TENTH AFFIRMATIVE DEFENSE

### (Obligations Discharged)

12.     As a Tenth and Separate Affirmative Defense, Respondent asserts that to the extent he was required to perform any duty or discharge any obligation by operation of law or contract, any such duty or obligation has been discharged, extinguished, subsumed, integrated, completed, or excused.

### ELEVENTH AFFIRMATIVE DEFENSE

### (No Breach)

13.     As an Eleventh and Separate Affirmative Defense, Respondent asserts that to the extent that it is established that there exists valid contract(s) and that the Respondent is bound by their provisions, there has been no breach of said contracts.

### TWELFTH AFFIRMATIVE DEFENSE

### (Release)

14.     As a Twelfth and Separate Affirmative Defense, Respondent alleges that Claimants have engaged in conduct and activities sufficient to constitute release of any alleged breach of duty or obligation, or other conduct, if any, and have thereby waived and relinquished

4

any right to the recovery sought in the Claimants' Demand against Respondent.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Accord and Satisfaction)

15.     As a Thirteenth and Separate Affirmative Defense, Respondent alleges that Claimants have engaged in conduct and activities sufficient to constitute an accord and satisfaction of any alleged breach of duty or obligation, or other conduct, if any, and have thereby waived and relinquished any right to the recovery sought in the Claimants' Demand against Respondent.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Novation)

16.     As a Fourteenth and Separate Affirmative Defense, Respondent alleges that Claimants have engaged in conduct and activities sufficient to constitute a novation of any alleged breach of duty or obligation, or other conduct, if any, and have thereby waived and relinquished any right to the recovery sought in the Claimants' Demand against Respondent.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Justification)

17.     As a Fifteenth and Separate Affirmative Defense, Respondent alleges that, at all relevant times, his conduct was justified under the law.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Excuse)

18.     As a Sixteenth and Separate Affirmative Defense, Respondent alleges that all performances by Respondent due to Claimants, if any, are excused.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Extinguish / Discharge)

19.    As a Seventeenth and Separate Affirmative Defense, Respondent alleges that all obligations and performances required by contract, if any, extinguished and/or were discharged upon the death of the decedents and do not bind the estates or the Respondent.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Privilege)

20.    As an Eighteenth and Separate Affirmative Defense, Respondent alleges that at all relevant times his conduct was privileged under the law.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Assumption of Risk)

21.    As a Nineteenth and Separate Affirmative Defense, Respondent alleges that Claimants are barred from any recovery herein on the basis that Claimants' alleged damages, if any, were legally caused by Claimants' carelessness, recklessness, and risks that Claimants were aware of and expressly or impliedly assumed prior to the incident(s) alleged in the Demand.  As a result of Claimants' assumption of the risk, Claimants' recovery is either barred or reduced proportionately.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Set-Off)

22.    As a Twentieth and Separate Affirmative Defense, Respondent alleges that if it is established that Respondent is in any manner legally responsible for any of the damages claimed by Claimants in any of the claims in the Claimants' Demand, Respondent is entitled to a set-off

of these damages incurred by Respondent as a result of the intentional, negligent and/or wrongful acts of the Claimants.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

23.    As a Twenty-First and Separate Affirmative Defense, Respondent alleges that Claimants' damages, if any, have been aggravated as a result of the failure of Claimants and their agents, attorneys, and/or representatives to exercise reasonable diligence in mitigating their claimed loss and damage.  Respondent's liability, if any, must therefore be limited to the amount of damage that would have been suffered, if any, had Claimants and their agents, attorneys, and/or representatives exercised the diligence required of them.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (No Damage)

24.    As a Twenty-Second and Separate Affirmative Defense, Respondent alleges that the Claimants' Demand, and each cause of action asserted therein, is barred because Claimants have not been injured or damaged by any act or omission of Respondent.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Damages Claimed Are Speculative)

25.    As a Twenty-Third and Separate Affirmative Defense, Respondent alleges that Claimants' claims for damages are speculative and uncertain and, therefore, not recoverable in this action.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Failure of Conditions Precedent)

26.     As a Twenty-Fourth and Separate Affirmative Defense, Respondent alleges that Claimants have failed to perform all conditions precedent on their part and such failure by Claimants to perform bars any recovery herein.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Performance and Satisfaction)

27.     As a Twenty-Fifth and Separate Affirmative Defense, Respondent alleges that he has fully performed and satisfied each and every obligation imposed upon he, if any, by agreement and by law.

## TWENTY SIXTH AFFIRMATIVE DEFENSE

### (No Proximate or Legal Causation)

28.     As a Twenty-Sixth and Separate Affirmative Defense, Respondent alleges that the damages, if any, alleged in the Claimants' Demand were not proximately or legally caused, in whole or in part, by any act or omission of Respondent.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Superseding Causation)

29.     As an Twenty-Seventh and Separate Affirmative Defense, Respondent alleges that the damages, if any, sought by Claimants are the result of causes independent and superseding to any alleged acts of Respondent and are due to causes that arose after Respondent's alleged acts ceased to have any impact on Claimants.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Intervening or Superseding Acts)

30.    As a Twenty-Eighth and Separate Affirmative Defense, Respondent alleges that Claimants' damages, if any, as alleged against Respondent, were caused, if at all, by the acts or omissions of persons, parties, attorneys, corporations, or other entities other than Respondent and such acts or omissions constitute intervening or superseding acts barring Claimants' claims against Respondent.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Contributory Negligence)

31.    As a Twenty-Ninth and Separate Affirmative Defense, Respondent alleges that to the extent Claimants sustained any of the damages alleged in the Claimants' Demand, Claimants are barred from any recovery herein on the basis that Claimants' own breach of agreement, negligence, carelessness, fault, failure to mitigate, wrongful conduct, and/or failure to properly manage its affairs as a reasonable, prudent business were the sole and proximate cause of the incident and injuries allegedly sustained herein.

## THIRTIETH AFFIRMATIVE DEFENSE

### (Contributory Negligence - Third Party)

32.    As an Thirtieth and Separate Affirmative Defense, Respondent alleges that to the extent Claimants sustained any of the damages alleged in the Claimants' Demand, said damages were proximately caused, in whole or in part, by the negligence, carelessness, fault, acts, omissions, wrongful conduct, and/or misconduct of other persons and/or entities over whom Respondent have not, at any relevant time, had any control.  Therefore, if Respondent is

ultimately held liable for any of such damages, the amount of Respondent's liability should be proportionately reduced, in light of said other persons' comparative fault.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

### (Comparative Fault)

33.    As a Thirty-First and Separate Affirmative Defense, Respondent alleges that if it is determined that one or any combination of named or unnamed persons or entities proximately caused any injury to Claimants, any liability for damages of Respondent be negated or reduced upon the comparative fault of the persons or entities, other than Respondent.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

### (*In Pari Delicto*)

34.    As a Thirty-Second and Separate Affirmative Defense, Respondent alleges that even if he was at fault for any of the conduct alleged in the Claimants' Demand, Claimants are also at fault, and therefore can make no recovery and are barred from recovering any damages in this matter under the doctrine of *in pari delicto*.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### (Acts or Omissions of Claimants)

35.    As a Thirty-Third and Separate Affirmative Defense, Respondent asserts that any damages suffered by Claimants were caused by the actions or omissions of Claimants or their agents, attorneys, or representatives.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (No Vicarious Liability)

36.    As a Thirty-Fourth and Separate Affirmative Defense, Respondent asserts that in

the event that any person or entity other than Respondent is held liable to Claimants for any of the damages alleged in the Claimants' Demand, Respondent is not vicariously liable for the acts or omissions of any such person or entity.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Indemnification and Contribution from Plaintiff)

37.    As a Thirty-Fifth and Separate Affirmative Defense, Respondent asserts that if it is established that Respondent is in any manner legally responsible for any of the damages claimed by Claimants in any of the claims in the Claimants' Demand, Respondent is entitled to indemnity or contribution from Claimants.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Indemnification and Contribution from Third Parties)

38.    As an Thirty-Sixth and Separate Affirmative Defense, Respondent asserts that if it is established that Respondent is in any manner legally responsible for any of the damages claimed by Claimants in any of the claims in the Claimants' Demand, such damages were proximately caused by other persons or entities and over whom Respondent had no control, and Respondent is entitled to indemnity or contribution from these other parties in an amount in direct proportion to the culpability of their conduct.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

### (Liquidated Damages)

39.    As a Thirty-Seventh and Separate Affirmative Defense, Respondent alleges that Claimants are not entitled to the damages claimed in the Demand, in that if it is established that Respondent is in any manner legally responsible for any of the damages, those damages are set

11

by the liquidated damages provision of the contracts.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

40.    As a Thirty-Eighth and Separate Affirmative Defense, Respondent alleges that the Claimants' Demand, and each claim asserted therein, is barred under the doctrine of unjust enrichment.

## THIRD-NINTH AFFIRMATIVE DEFENSE

### (Laches)

41.    As a Thirty-Ninth and Separate Affirmative Defense, Respondent alleges that Plaintiff delayed an unreasonable amount of time before commencing this suit to the prejudice of Respondent such that all causes of action in the Claimants' Demand against Respondent are barred and precluded by the doctrine of laches.

## FORTIETH AFFIRMATIVE DEFENSE

### (Good Faith)

42.    As a Fortieth and Separate Affirmative Defense, Respondent alleges that, at all relevant times, his conduct was reasonable, performed in good faith, and privileged under the law.

## FORTY-FIRST AFFIRMATIVE DEFENSE

### (Respondent Acted in the Best Interests of the Estates)

43.    As a Forty-First and Separate Affirmative Defense, Respondent alleges that at all times Respondent acted in the best interest of the estates.

12

## FORTY-SECOND AFFIRMATIVE DEFENSE

### (Mistake of Fact)

44.    As a Forty-Second and Separate Affirmative Defense, Respondent alleges that Claimants' claim is barred by the doctrine of mistake of fact.

## FORTY-THIRD AFFIRMATIVE DEFENSE

### (Mistake of Law)

45.    As a Forty-Third and Separate Affirmative Defense, Respondent alleges that Claimants' claim is barred by the doctrine of mistake of law.

## FORTY-FOURTH AFFIRMATIVE DEFENSE

### (Suspension of Performance)

46.    As a Forty-Fourth and Separate Affirmative Defense, Respondent alleges that his obligations and duty of performance, if any, under the contracts that are the subject of this action were suspended or otherwise extinguished by reason of Claimants' breaches of the contracts.

## FORTY-FIFTH AFFIRMATIVE DEFENSE

### (Anticipatory Breach)

47.    As a Forty-Fifth and Separate Affirmative Defense, Respondent alleges that Claimants' claim is barred by the doctrine of anticipatory breach.

## FORTY-SIXTH AFFIRMATIVE DEFENSE

### (Contractual Obligations Discharged)

48.    As a Forty-Sixth and Separate Affirmative Defense, Respondent alleges that to the extent he was required to perform any duty or discharge any obligation under contract or by operation of law, any such duty or obligation has been discharged, extinguished, subsumed,

integrated, completed and/or excused.

## FORTY-SEVENTH AFFIRMATIVE DEFENSE

### (Violation of Public Policy)

49.     As a Forty-Seventh and Separate Affirmative Defense, Respondent alleges that the Claimants' actions constitute a violation of public policy.

## FORTY-EIGHTH AFFIRMATIVE DEFENSE

### (Breach of Statutory Duties)

50.     As a Forty-Eighth and Separate Affirmative Defense, Respondent alleges that Claimants' actions constitute a breach of the Claimants' statutory duties.

## FORTH-NINTH AFFIRMATIVE DEFENSE

### (Impossibility of Performance)

51.     As a Forth-Ninth and Separate Affirmative Defense, Respondent alleges that the Respondent's performance of any alleged duty and/or obligation was/is impossible.

## FIFTIETH AFFIRMATIVE DEFENSE

### (Frustration of Purpose)

52.     As a Fiftieth and Separate Affirmative Defense, Respondent alleges that the purpose of Respondent's performance of any alleged duty and/or obligation has been frustrated.

## FIFTY-FIRST AFFIRMATIVE DEFENSE

### (Exercise of Constitutional Rights)

53.     As a Fifty-First and Separate Affirmative Defense, Respondent alleges that Claimants' Demand, and each claim alleged therein, is barred in that the Respondent's alleged conduct was done in exercise of his Constitutional rights under state and federal law.

14

## FIFTY-SECOND AFFIRMATIVE DEFENSE

### (Legal Responsibility for Welfare of Another)

54.    As a Fifty-Second and Separate Affirmative Defense, Respondent alleges that Claimants' Demand, and each claim alleged therein, is barred in that Respondent's alleged conduct was performed pursuant to the legal responsibility for the welfare of others.

## FIFTY-THIRD AFFIRMATIVE DEFENSE

### (Truth and Honesty)

55.    As a Fifty-Third and Separate Affirmative Defense, Respondent alleges that Claimants' Demand, and each claim alleged therein, is barred in that the Respondent's alleged statements were truthful and honest.

## FIFTY-FOURTH AFFIRMATIVE DEFENSE

### (Public Safety)

56.    As a Fifty-Fourth and Separate Affirmative Defense, Respondent alleges that Claimants' Demand, and each claim alleged therein, is barred in that the Respondent's alleged conduct was done in furtherance of public safety and on a public issue.

## FIFTY-FIFTH AFFIRMATIVE DEFENSE

### (Litigation Privilege)

57.    As a Fifty-Fifth and Separate Affirmative Defense, Respondent alleges that Claimants' Demand, and each claim alleged therein, is barred in that the Respondent's alleged statements were made in furtherance of and in connection with a judicial proceeding.

## FIFTY-SIXTH AFFIRMATIVE DEFENSE

### (Fair Comment)

58.     As a Fifty-Sixth and Separate Affirmative Defense, Respondent alleges that Claimants' Demand, and each claim alleged therein, is barred in that the Respondent's alleged statements constitute fair comment.

## FIFTY-SEVENTH AFFIRMATIVE DEFENSE

### (Failure of Consideration)

59.     As a Fifty-Seventh and Separate Affirmative Defense, Respondent alleges that Claimants' Demand, and each claim alleged therein, is barred for failure of proper and sufficient consideration.

## FIFTY-EIGHTH AFFIRMATIVE DEFENSE

### (Conflict of Interest and Prejudice)

60.     As a Fifty-Eighth and Separate Affirmative Defense, Respondent alleges that members of the Tribunal have conflicts of interest arising out of their significant ties to and relationships with Claimants, their officers, directors, employee, agents and attorneys, and that Respondent was denied participation in the selection of the Tribunal.

## FIFTY-NINTH AFFIRMATIVE DEFENSE

### (Vacation of Award)

61.     As a Fifty-Ninth and Separate Affirmative Defense, Respondent alleges that due to the conduct of the International Centre for Dispute Resolution, Tribunal and the conflicts of interest involved, there exist grounds for vacation of any award issued by this Tribunal, pursuant to 9 U.S.C. § 10.

16

## SIXTIETH AFFIRMATIVE DEFENSE

### (Modification of Award)

62.     As a Sixtieth and Separate Affirmative Defense, Respondent alleges that due to the conduct of the International Centre for Dispute Resolution and the Tribunal, there exist grounds for modification of any award issued by this Tribunal, pursuant to 9 U.S.C. § 11.

## SIXTY-FIRST AFFIRMATIVE DEFENSE

### (Improper Arbitration Organization and Rules)

63.     As a Sixty-First and Separate Affirmative Defense, the International Centre for Dispute Resolution is the improper arbitration organization and the International Arbitration Rules are the improper rules to govern this matter, pursuant to the subject arbitration provisions.

## SIXTY-SECOND AFFIRMATIVE DEFENSE

### (Unenforceable Contract)

64.     As a Sixty-Second and Separate Affirmative Defense, Respondent alleges that the contracts on which Claimants assert their claim, including all of the terms, conditions, obligations and provisions therein, are invalid, void, voidable, unconscionable, and unenforceable.

## SIXTY-THIRD AFFIRMATIVE DEFENSE

### (Additional Defenses)

65.     As a Sixty-Third and Separate Affirmative Defense, as discovery and investigation continue, Respondent reserves the right to allege additional defenses as they become known to Respondent as to all claims asserted against him, whether or not submitted and/or tendered.

17

## COUNTER-CLAIM

66.     On January 5,2005, Richard P. Nordan, as Ancillary Administrator for the separate Estates of Stephen S. Helvenston, Mike R. Teague and Jerry Zovko, filed a civil action for wrongful death and rescission of written instrument for fraud against Blackwater Security Consulting, LLC, Blackwater Lodge & Training Center, Inc., Justin L. McQuown and Thomas Powell in the North Carolina Superior Court for Wake County (Case No. 05CV000173). A true and correct copy of said Complaint is attached hereto as Exhibit "A" and incorporated herein by reference.

67.     On April 20 and May 11, 2007, U.S. District James C. Fox issued orders compelling these state court claims to arbitration. True and correct copies of said orders are attached hereto as Exhibits "B" and "C," respectively, and incorporated herein by reference.

68.     Consistent with Judge Fox's orders, on or about May 15, 2007, Respondent filed a Demand for Arbitration with the American Arbitration Association in its Southeast Regional Office in Atlanta, Georgia. A true and correct copy of said Demand for Arbitration is attached hereto as Exhibit "D" and incorporated herein by reference.

69.     Shortly thereafter, Respondent's Demand was inexplicably transferred, without any notice, to the International Centre for Dispute Resolution ("ICDR") in New York. Respondent objected, and hereby continues to object, to the consolidation of its Demand with the Claimants' Demand.

70.     On or about June 11, 2007, the ICDR notified the parties that Respondent's Demand would be accepted as a counter-claim in this matter, subject to the Tribunal's final determination. A true and correct copy of a correspondence from Chris Alberti of the ICDR

18

dated June 11, 2007, is attached hereto as Exhibit "E" and incorporated herein by reference.

71.    By operation of the foregoing, Respondent's state court claims are, and have been already, asserted as counter-claims in this matter.  While asserting said counter-claims here and while preserving his rights to proceed on said counter-claims, Respondent also hereby objects to this Tribunal and the ICDR presiding over said counter-claims.

72.    The orders by Judge Fox compelling arbitration of the state court claims are currently on review at the Fourth Circuit Court of Appeals.  Even if arbitration under the relevant contracts is proper, the wrongful death claim falls outside the scope of the arbitration provision and should proceed in North Carolina state court.

73.    Moreover, even if arbitration of one or both of the Respondent's claims is proper, said arbitration should not be conducted before this Tribunal or the ICDR.  By the time Respondent's state court claims were ordered to arbitration (at the earliest April 20, 2007), this Tribunal had already been unilaterally selected by Claimants.  Even if Respondent waived his right to participate in the selection of the Tribunal for *Claimants' Demand* (which he did not), Respondent certainly did not waive participation in the selection process of the Tribunal to preside over *his Demand* (consisting of the state court claims), which were only ordered to arbitration on April 20 and May 11, 2007.

74.    Respondent is asserting the state court claims here, pursuant to Judge Fox's orders and the correspondence by Mr. Alberti, out of an abundance of caution, but also objects to the orders compelling arbitration, objects to compelling arbitration of the wrongful death claim, objects to the ICDR handling these counter-claims, objects to the application of the International Arbitration Rules, and objects to this Tribunal hearing these counter-claims since he never had

an opportunity to participate in the selection of the arbitrators to hear his claims.

## PRAYER

**WHEREFORE,** Respondent pray judgment as follows:

### ON CLAIMANTS' CLAIM:

1.  That the subject contracts, and all the terms, conditions and obligations therein, be found to be invalid and unenforceable;

2.  That Claimants' Demand be dismissed, with prejudice, as against Respondent;

3.  That judgment be entered in favor of Respondent and against Claimants;

4.  That Claimants take nothing by way of the Demand;

5.  That Respondent's recover reasonable attorneys' fees and costs incurred in connection with defending this action, as permitted by law or contract; and

6.  For such other and further relief as the Tribunal deems appropriate.

### ON RESPONDENT'S COUNTER-CLAIM:

1.  For all of the relief prayed for in the state court complaint which now forms the counter-claims in this matter; and

2.  For such other and further relief as the Tribunal deems appropriate.

Dated: June 14, 2007                    **CALLAHAN & BLAINE, APLC**

                              By: _____/s/Marc P. Miles_____

20

DANIEL J. CALLAHAN
BRIAN J. McCORMACK
MARC P. MILES
3 Hutton Centre Drive, Suite 900
Santa Ana, California 92707
(714) 241-4444
Attorneys for Plaintiff
RICHARD P. NORDAN, as the Ancillary
Administrator of the separate Estates of STEPHEN
S. HELVENSTON, MIKE R. TEAGUE, JERKO
GERALD ZOVKO and WESLEY J.K.
BATALONA

Dated: June 14, 2007                    **KIRBY & HOLT, LLP**

By:    _____/s/David F. Kirby_____
DAVID F. KIRBY
WILLIAM B. BYSTRYNSKI
3201 Glenwood Avenue, Suite 100
Raleigh, North Carolina 27612
(919) 881-2111
Attorneys for Plaintiff
RICHARD P. NORDAN, as the Ancillary
Administrator of the separate Estates of STEPHEN
S. HELVENSTON, MIKE R. TEAGUE, JERKO
GERALD ZOVKO and WESLEY J.K.
BATALONA

G:\2525\2525-02\Pleadings\Federal\BW Arbitration Claim\Stmt of Defense & Counterclaim.wpd

21

# Exhibit "A"

**Exhibit "A"**

050V000173

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
)
       Plaintiffs, )
)
      v. )
)
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation, JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
)
      Defendants. )
)

**COMPLAINT**
**(Jury Trial Demanded)**

FILED
2005 JAN -5 PM 4: 04
WAKE COUNTY, C.S.C.
BY _____

Plaintiff RICHARD P. NORDAN, as the Ancillary Administrator of the Estate of

STEPHEN S. HELVENSTON, the Estate of MIKE R. TEAGUE, the Estate of JERKO

GERALD ZOVKO, and the Estate of WESLEY J.K. BATALONA, allege against Defendants,

BLACKWATER SECURITY CONSULTING, LLC, a Delaware Limited Liability Company;

BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware Corporation, JUSTIN

L. MCQUOWN, an individual; and THOMAS POWELL, an individual, and each of them, as

follows:

1

**PARTIES**

1.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Stephen S. Helvenston, by the Superior Court of Wake County, North Carolina, on December 6, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Stephen S. Helvenston.

2.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Mike R. Teague, by the Superior Court of Wake County, North Carolina, on December 6, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Mike R. Teague.

3.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Jerko Gerald Zovko, by the Superior Court of Wake County, North Carolina, on December 6, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Jerko Gerald Zovko.

4.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Wesley J.K. Batalona, by the Superior Court of Wake County, North Carolina, on December 7, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Wesley J.K. Batalona.

5.    At all relevant times, Defendant BLACKWATER SECURITY CONSULTING,

2

LLC has been and is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Moyock, North Carolina.

6.     At all relevant times, Defendant BLACKWATER LODGE AND TRAINING CENTER, INC. has been and is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Moyock, North Carolina.

7.     Defendants BLACKWATER SECURITY CONSULTING, LLC and BLACKWATER LODGE AND TRAINING CENTER, INC. are referred to herein collectively as "BLACKWATER."

8.     Plaintiff is informed and believes and thereon alleges that at all relevant times, Defendant JUSTIN MCQUOWN is an individual, currently residing in Virginia Beach, Virginia.

9.     Plaintiff is informed and believes and thereon alleges that at all relevant times, Defendant THOMAS POWELL is an individual, currently residing in Lynn Haven, Florida.

10.     Plaintiff is informed and believes, and thereon alleges that at all times relevant, each Defendant, was the agent, servant, representative and/or employee of each of the other Defendants, and that in doing the things hereinafter alleged, each Defendant was acting within the course and scope of his or her authority as such agent, servant, representative and/or employee, with the permission, knowledge, consent and ratification of each of the other Defendants.  Unless otherwise indicated, all Defendants are collectively referred to herein as the "Defendants."

11.     Plaintiff is informed and believes and thereon alleges that all contracts and agreements herein involved were to be performed in Iraq, and the surrounding regions and countries.

3

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### OVERVIEW

12.    On March 31, 2004, Stephen Scotten ("Scott") Helvenston, Mike R. Teague, Jerko Gerald ("Jerry") Zovko, and Wesley J.K. Batalona were murdered by Iraqi insurgents while working as security contractors for BLACKWATER. These individuals were executed, burned, beaten, and two of them were strung up on a bridge over the Euphrates River. The fact that these four Americans found themselves located in the high-risk, war-torn City of Fallujah without armored vehicles, automatic weapons, and fewer than the minimum number of team members was no accident. Instead, this team was sent out without the required equipment and personnel by those in charge at BLACKWATER.

13.    When these four individuals signed on with BLACKWATER to be security contractors in Iraq, they did so with the understanding that BLACKWATER would provide them with certain protections, tools and information to allow them to perform their job.

   a.    They were told that each security mission would be handled by a team of no less than six (6) members.

   b.    They were told that each security mission would be performed in armored vehicles.

   c.    They were told that these security teams would be comprised of at least two armored vehicles, with at least three security contractors in each vehicle, which would provide for a driver, a navigator, and a rear-gunner.

   d.    They were told that the rear-gunner would have a heavy automatic weapon, such as a "SAW Mach 46," which could fire up to 850 rounds per minute, allowing the

4

gunner to fight off any attacks from the rear.

           e.     They were told that they would be given at least 24-hours notice prior to any security mission.

           f.     They were told that each security detail mission would be subject to a Risk Assessment completed prior to the mission, and that if the threat level was too high, they would have the option of not performing the mission.

           g.     They were told that they would be afforded the opportunity to review the travel routes, gather intelligence about each mission, do a pre-trip inspection of the route and determine the proper logistics to carry out the security detail.

           h.     They were told that they would arrive in the Middle East and have at least 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through the area.

     14.     All of these representations are what these individuals relied upon in deciding to become security contractors for BLACKWATER. Unfortunately, BLACKWATER's representations were untrue and BLACKWATER cut corners in the interest of higher profits, which ultimately resulted in the deaths of these four Americans.

     15.     On March 30, 2004, Helvenston, Teague, Zovko and Batalona were sent out on a security mission by BLACKWATER. However, BLACKWATER intentionally and knowingly failed to provide them with the protections, tools and information that it initially represented.

           a.     BLACKWATER did not provide them with the minimum number of six (6) members on the security detail team.

           b.     BLACKWATER did not provide them with armored vehicles.

5

    c.     BLACKWATER did not permit them to have three team members in each vehicle, which resulted in each vehicle containing only a driver and a navigator, but no rear-gunner to quell any attacks.

    d.     BLACKWATER did not provide them with heavy automatic machine guns, but instead merely with semi-automatic rifles (which had not even been tested or sighted).

    e.     BLACKWATER did not provide them with 24-hours notice of the security mission.

    f.     BLACKWATER did not conduct a Risk Assessment prior to the March 30, 2004 security mission, and the Plaintiff is informed and believes and thereon alleges that it actually created one after these four Americans were killed.

    g.     BLACKWATER did not provide them with the opportunity to gather intelligence concerning the travel route, do a pre-route inspection, and even refused to give them maps of the area.

    h.     BLACKWATER did not send them to the Middle East 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through Iraq, but instead they were sent over only a few days before they became operational.

16.    As such, BLACKWATER intentionally and knowingly sent Helvenston, Teague, Zovko and Batalona into known harm's way without the needed and promised protections.

17.    On March 31, 2004, Helvenston, Teague, Zovko and Batalona were attempting to carry out a security mission for BLACKWATER. Without having any information about the route or even a map of the area, they became lost and ended up driving through the center of the

6

City of Fallujah. While stopped in traffic, several armed Iraqi insurgents walked up behind these

two unarmored vehicles and repeatedly shot these four Americans at point blank range, dragged

them from their vehicles, beat, burned and disfigured them and desecrated their remains. Had

they been provided with the protections, tools and information that they were promised when

they signed up for their job at BLACKWATER, Helvenston, Teague, Zovko and Batalona would

be alive today.

## THE CONTRACTS

18.    ESS Support Services Worldwide, Eurest Support Services (Cyprus)

International, Ltd. ("ESS") is a business with two divisions: one which provides catering support

services and the other which provides design and building services to U.S. Armed Forces and

other U.S. contracting agencies in Iraq and Kuwait.

19.    Regency Hotel and Hospital Company ("REGENCY") is a Kuwaiti company that

entered into an agreement with ESS to support its services in the Middle East. REGENCY is

headquartered in Kuwait City and is run by an American businessman, Tim Tapp, and a Kuwaiti

National, Jameel A.R. Al Sane.

20.    Initially, the security detail for the ESS operations was provided by a company

called Control Risk Group ("CRG").

21.    One of the owners of REGENCY, Jameel A.R. Al Sane, developed a business

relationship with a BLACKWATER employee, John Potter. Based upon this relationship, Mr.

Al Sane proposed that BLACKWATER and REGENCY join forces and submit a bid to ESS to

replace CRG as the provider of security services for the food convoys. Ultimately, REGENCY

7

and BLACKWATER prevailed on their bid to ESS, and were awarded the security contract for

ESS's catering operations in the Middle East.

22.    Initially, REGENCY and BLACKWATER partnered together and entered into a

contract with ESS to provide security services for ESS's operations.  On March 8, 2004, this

contract (the "PRIMARY CONTRACT") was entered into by ESS, on the one hand, and

REGENCY and BLACKWATER, on the other.

23.    Plaintiff is informed and believes and thereon alleges that BLACKWATER

immediately became concerned about its partnership with REGENCY in the PRIMARY

CONTRACT, because it wanted complete control over the security detail, without input from

REGENCY.  Pressure was applied by BLACKWATER's headquarters to resolve the problems

so that the PRIMARY CONTRACT could be implemented quickly.  To remedy this issue, the

PRIMARY CONTRACT was duplicated into another almost identical sub-contract between

REGENCY and BLACKWATER (the "SUB-CONTRACT"), which was entered into on March

12, 2004.

24.    Due to the hostile environment of the Iraqi theater, the PRIMARY CONTRACT

mandated that each security detail consist of a minimum team size of six (6) operators, with a

minimum of two vehicles, to support ESS movements at all times.  In addition, the PRIMARY

CONTRACT required that all of those vehicles were to be armored vehicles.

25.    However, when the SUB-CONTRACT between REGENCY and

BLACKWATER was drafted, the armored vehicle provision was surreptitiously omitted.

Plaintiff is informed and believes and thereon alleges that this was done so as to allow

BLACKWATER to save $1.5 million on the cost of armored vehicles.  Prior to the

8

implementation of this SUB-CONTRACT, John Potter brought to the attention of

BLACKWATER's managing agents, including Mike Rush, who is the Director of

BLACKWATER, the fact that the SUB-CONTRACT did not contain the requirement for

armored vehicles.

26.     Plaintiff is informed and believes and thereon alleges that since Mike Rush had

already informed BLACKWATER's president, Gary Jackson, that the contract problems had

been resolved, he refused to redraft and renegotiate the SUB-CONTRACT, all the while

knowing that this failure would seriously jeopardize the health and safety of BLACKWATER's

security contractors in Iraq.

27.     Due to the absolute necessity of armored vehicles in the hostile Iraq theater,

BLACKWATER's initial Program Manager for the ESS project, John Potter, insisted that the

SUB-CONTRACT include armored vehicles, not only to comply with the PRIMARY

CONTRACT, but more importantly to protect the security contractors who would be working in

the area.  However, obtaining armored vehicles would not only be an expense to

BLACKWATER, but would also cause a delay in commencing operations.  Thus, on March 24,

2004, BLACKWATER fired Potter as Program Manager and replaced him with another

BLACKWATER employee, JUSTIN MCQUOWN.

28.     Plaintiff is informed and believes and thereon alleges that MCQUOWN seriously

lacked the education, training and experience to be the Program Manager of the ESS project.

Nonetheless, MCQUOWN hurried preparations along to achieve an early implementation of the

contract.  MCQUOWN failed to provide adequate training and intelligence data to the security

contractors hired by BLACKWATER for the ESS project.  MCQUOWN even denied the

9

contractors the opportunity to properly test and sight their weapons before becoming operational or to review the travel routes with the security contractors from CRG before taking over the ESS project.

29.     At no time did BLACKWATER advise ESS that the support vehicles would not be armored; nor did BLACKWATER advise the security contractors of the falsity of its representations and promises, especially concerning the armored vehicles.

30.     Prior to entering into their individual Independent Contractor Service Agreements with BLACKWATER, Helvenston, Teague, Zovko and Batalona were all advised of the requirements of the PRIMARY CONTRACT, which mandated that the security detail teams would be comprised of no less than six (6) members and that each team would be operating with no less than two armored vehicles. They were never told that BLACKWATER deleted the requirement of armored vehicles from the SUB-CONTRACT. This fact was intentionally concealed from them by BLACKWATER.

31.     On or about March 25, 2004, Helvenston, Teague, Zovko and Batalona entered into their individual Independent Contractor Service Agreements in reliance upon the representations that BLACKWATER was affording them certain protections, tools and information as set forth in the PRIMARY CONTRACT. Helvenston, Teague, Zovko and Batalona, and each of them, were hired by BLACKWATER as independent contractors, and were at no relevant time employees of BLACKWATER. By the express terms of the Independent Contractor Service Agreements, they incorporate the terms of the SUB-CONTRACT, which in turn incorporates the terms of the PRIMARY CONTRACT. BLACKWATER, choosing the path of maximizing its profits over the protection of its security

10

contractors, did not provide the contractors with the promised protections, tools and information.

32.     Plaintiff is informed and believes and thereon alleges that at the time the PRIMARY CONTRACT was being negotiated, BLACKWATER was negotiating a similar contract with ESS's construction division to also provide security services for ESS's construction projects. The ill-fated March 31, 2004 mission was an attempt by BLACKWATER to prove to ESS that it could deliver the security detail ahead of schedule, even though the necessary vehicles, equipment and support logistics were not in place. These pending negotiations regarding the construction security contract with ESS, and the money that would flow to BLACKWATER as a result thereof, was one of the motivations for placing Helvenston, Teague, Zovko and Batalona in harm's way without the required protections, tools and information.

## THE PREPARATIONS

33.     When CRG learned that BLACKWATER would replace it on the ESS security detail, CRG served notice that it would phase out all of its personnel by March 29, 2004. However, pursuant to the PRIMARY CONTRACT and the SUB-CONTRACT, BLACKWATER was not scheduled to be operational until April 2, 2004, at the earliest. The first phase of CRG's multi-phase withdrawal from the ESS security detail occurred on March 19, 2004. The BLACKWATER personnel designated to replace the CRG employees did not arrive in Iraq until March 18, 2004, leaving grossly inadequate time to train them and acclimate them to the country.

34.     Plaintiff is informed and believes and thereon alleges that BLACKWATER and

11

JUSTIN MCQUOWN continued to hastily make preparations to become operational as the security detail in advance of the April 2, 2004 start date, while at the same time refusing to allow the security contractors that had arrived in Kuwait to learn the routes from CRG. In doing so, they jeopardized the training, intelligence and protections needed for Helvenston, Teague, Zovko and Batalona to perform their jobs.

35.     When Mr. Potter helped negotiate the original contracts, they called for a 30-day implementation after the signing of the contracts. The PRIMARY CONTRACT was entered into on March 8, 2004. The SUB-CONTRACT was not entered into until March 12, 2004. Under the *original* terms of these agreements, BLACKWATER would not have been operational until the middle of April 2004. However, the contracts were modified to provide for operational status within 21 days, resulting in the April 2, 2004 start date.

36.     Plaintiff is informed and believes and thereon alleges that BLACKWATER's Mike Rush was supposed to send all 30 BLACKWATER contractors to the Middle East immediately, so that there could be a smooth transition with the CRG team, and so they could perform all the necessary training prior to becoming operational. However, Mike Rush did not immediately send the BLACKWATER contractors, thereby jeopardizing their training and preparation. This delay in sending the BLACKWATER contractors to the Middle East was done purposely to save expenses and increase profits. Under the contracts, BLACKWATER was being paid up front, regardless of the amount of people that it had in Iraq. Therefore, every day that BLACKWATER held the contractors back in the United States, it would not have to pay the contractors their high-risk detail salaries, but would still reap the benefit of obtaining money for those contractors pursuant to the contracts with ESS and REGENCY.

12

37.    Plaintiff is informed and believes and thereon alleges that even after the security contractors arrived in the Middle East, they were denied the ability to gather intelligence, become acclimated to the territory, travel the routes and learn local customs. As CRG was phasing out its security details for ESS, it continually contacted BLACKWATER to arrange for the new security contractors to accompany CRG on their security missions. This was designed to allow the BLACKWATER security contractors to become familiar with the area, learn the safe routes, interact with the ESS personnel and acquire the logistical information and intelligence to protect them on future security details. JUSTIN MCQUOWN intentionally refused to allow the BLACKWATER security contractors to conduct these ride-alongs with the CRG teams.

38.    Per the contracts, Helvenston, Teague, Zovko and Batalona were supposed to be supplied with "SAW Mach 46" weapons, which are heavy automatic machine guns that had the capacity of firing up to 850 rounds per minute. Instead, they were provided with Mach 4 semi-automatic weapons, because BLACKWATER's managing agents, Mike Rush and Brian Berrey, refused to purchase the more expensive heavy automatic weapons. In fact, the Mach 4 weapons did not even arrive in Kuwait until March 18, 2004, where they still needed to be assembled.

39.    The contractors never had an opportunity to test, fire or sight their weapons before their security details. MCQUOWN told them that there was no time for them to be able to shoot their weapons to determine their accuracy and make necessary adjustments. This basic act of security preparation was not permitted, despite a BLACKWATER policy in place in Kuwait which provided for vehicle driving, training and weapons sighting to be performed prior to the commencement of any security detail.

13

## ANIMOSITY TOWARD THE CONTRACTORS

40.    Plaintiff is informed and believes and thereon alleges that JUSTIN MCQUOWN harbored extreme animosity toward Scott Helvenston relating to Helvenston's superior credentials, abilities, training, education, experience and knowledge.  This animosity dated back to the training program at BLACKWATER's facility in North Carolina, prior to their deployment under the ESS project.  MCQUOWN was a BLACKWATER instructor of classes that Helvenston attended.  However, MCQUOWN seriously lacked the education, training and experience to be a competent instructor.  On the other hand, Helvenston had been a Navy SEAL for many years and had acquired a vast amount of expertise.

41.    Plaintiff is informed and believes and thereon alleges that during training, MCQUOWN would often improperly instruct the class or provide erroneous information, tactics or techniques.  On occasion, Helvenston would attempt to politely assist MCQUOWN by offering his expertise on the correct manner of the particular training exercise.  The fact that MCQUOWN's lack of education and experience was being exposed infuriated him and ignited his hatred toward Helvenston.  Ultimately, MCQUOWN caused derogatory comments to be placed in Helvenston's BLACKWATER personnel file.

42.    Originally, John Potter was the Program Manager for the ESS project; however, once he complained that the BLACKWATER contractors were insufficiently protected because they were not receiving the promised armored vehicles and heavy weapons (as required by the PRIMARY CONTRACT), he was removed from his position as Program Manager.  JUSTIN MCQUOWN was then promoted and replaced John Potter as the Program Manager for the ESS project.

14

## THE CHANGE IN MISSION

43.     When Helvenston originally arrived in Kuwait on or about March 18, 2004, he was placed on a six (6) man security detail team.  On or about March 27, 2004, Helvenston and his team were advised that they would be leaving in two days for Baghdad to start their first mission.  However, on March 28, 2004, at approximately 10:00 p.m. that evening, while Helvenston and other teammates were at dinner in a local restaurant, MCQUOWN called Helvenston and informed him that he needed to pack up immediately and that he would be leaving at 5:00 a.m. the next morning on a security mission to Baghdad with a different team, with which he had no prior experience or training.

44.     At that time, Helvenston was feeling physically ill and informed MCQUOWN that he was not in a condition to be able to leave early the following morning.  Helvenston discussed the situation with his teammates at dinner, and another Blackwater contractor, Chris Wyse, who had been operating in the Middle East for some time, offered to take Helvenston's place on the mission the next morning.

45.     Helvenston and his teammates then returned to their rooms as Helvenston was feeling physically ill.  Shortly thereafter, JUSTIN MCQUOWN and Jim Graham burst into Helvenston's bedroom and aggressively approached Helvenston while he was lying in his bed.  While it appeared that MCQUOWN was going to physically attack Helvenston, he did not, but instead screamed at and berated him—calling Helvenston a "coward" and other demeaning and derogatory names.  MCQUOWN then threatened to fire Helvenston if he did not leave early the next morning with the new team.

46.     Helvenston reiterated that he was physically ill and was simply not able to leave

15