# EXHIBIT B2

Dockets.Justia.com

on his first mission into Iraq in his present condition. At that time, yet another Blackwater contractor offered to replace Helvenston in the following day's mission. However, due to MCQUOWN's animosity toward Helvenston, he refused to replace him with any other contractor, despite these two willing offers.

47.     Eventually, Helvenston was forced to defend himself as MCQUOWN became more hostile and combatant toward him, which culminated in Helvenston chasing MCQUOWN and Graham out of his bedroom. As MCQUOWN was leaving, he told Helvenston that he was fired.

48.     Shortly thereafter, MCQUOWN returned to Helvenston's bedroom and confiscated his weapons. At that time, MCQUOWN also told Helvenston that he would still be leaving at 5:00 a.m. the following morning with a new team to go to Baghdad. Helvenston had never met any of these team members, did not know where he was going, was physically ill and tired, and did not have his bags prepared to be leaving early the following morning. It was virtually unheard of to take a single person, like Scott Helvenston, and place him on a different group with whom he had never trained or even met.

49.     That night, Helvenston drafted an e-mail to the "Owner, President and Upper-Management" of BLACKWATER. In this e-mail, he exposed JUSTIN MCQUOWN's erratic behavior and plot against him, and requested their intervention—which unfortunately never came. This was one of Scott Helvenston's very last communications.

16

## THE INCIDENT

50.     Once Helvenston and his new team arrived in Baghdad, they were under the direction of Blackwater employee, TOM POWELL (the Site Manager in Baghdad), who answered directly to JUSTIN MCQUOWN (the Program Manager of the entire ESS project).

51.     Plaintiff is informed and believes and thereon alleges that at that time, TOM POWELL had six (6) Blackwater contractors in Baghdad to perform the security detail which was required by ESS.  However, at the direction of JUSTIN MCQUOWN, TOM POWELL sent only four contractors on the security detail, in direct violation of all of BLACKWATER's policies and agreements.  Those four security contractors were Scott Helvenston, Mike Teague, Jerry Zovko and Wesley Batalona.  The other two contractors were kept behind at the team house to perform menial, clerical work.

52.     Sending out a security team of only four individuals was contrary to the provisions of all of the contracts, which required a minimum of six (6) team members on each and every security detail, and was contrary to the promises made to these men upon their hire with BLACKWATER.  Moreover, the U.S. State Department also has policies for personnel security details and require a six-man detail working in the threat level of Iraq.  The ESS contracts specifically provided that the training and standard operating procedures would be consistent with the State Department.  However, all of these requirements for six-man teams were completely disregarded by MCQUOWN and POWELL.

53.     The two vehicles that this four-man team drove were not armored vehicles.  This was contrary to the express terms of the PRIMARY CONTRACT, which were incorporated into the SUB-CONTRACT and the Independent Contractor Service Agreements, and was contrary to

17

what was told to the security contractors in inducing them to execute their Independent Contractor Service Agreements.

54.    Sending four men on the security mission, instead of the required six, essentially took away the team's ability to defend itself. Not having one driver, one navigator and a rear-gunner with a 180 degree field of fire, the team never had a chance. By placing only two individuals in the car without the rear-gunner, the insurgents were able to literally walk up behind the vehicles and open fire upon them at close range. Also, since the four-man team was not traveling in armored vehicles, they had no protection against the small arms fire that they encountered.

55.    In Baghdad, Helvenston, in the very short amount of time that he had before being sent out on this mission, attempted to obtain maps of the area where they were supposed to be traveling. Plaintiff is informed and believes and thereon alleges that a BLACKWATER employee, Mark Furrad, refused to give him maps of the area, and instead callously told him that it was too late for maps and to just do his job with what he had. The team had no knowledge of where they were going, no maps to review, and had nothing to guide them to their destination.

56.    Plaintiff is informed and believes and thereon alleges that JUSTIN MCQUOWN and TOM POWELL knew that sending Scott Helvenston and the three other team members out on a mission into Fallujah in this condition—without a six-member team, without armored vehicles, and without directions or maps—could result in death to the entire team.

57.    On March 30, 2004, JUSTIN MCQUOWN and TOM POWELL sent this team out, without the required six-members, without armored vehicles and without even a map for directions, to escort three ESS flatbed trucks from the City of Taji to a U.S. Army base in Iraq,

18

commonly referred to as Camp Ridgeway. Because this team was not given the time to properly

prepare, was not able to plot out the route and destination and was denied the opportunity to even

see maps of the area, they became lost during their transport of these ESS trucks.

58.     As night was falling in Iraq on March 30, 2004, the four-man security team and

its convoy were still lost. They were able to find a nearby U.S. Marine base, commonly referred

to as Camp Fallujah. They decided to stay the night at this Marine base and attempt to find their

way in the morning.

59.     On March 31, 2004, the team made another attempt to transport the ESS trucks to

Camp Ridgeway. Camp Ridgeway was located approximately forty-five minutes away from

Camp Fallujah, provided a route was taken directly through the center of the City of Fallujah. At

that time, Fallujah was universally known to be extremely hostile territory in control of Iraqi

insurgents. In fact, as on March 31, 2004, the U.S. military and coalition forces had not yet

attempted to enter the center of Fallujah.

60.     However, because this four-man BLACKWATER team had not been able to

perform a pre-trip analysis of their route and was denied maps and logistical information

concerning the area, they set out toward Camp Ridgeway on a road which led directly through

the heart of the hostile Fallujah. Unbeknownst to them, there was an alternative, safer route

which led around the outskirts of Fallujah and would have only taken them approximately two

and a half hours longer to get to Camp Ridgeway.

61.     As this four-man BLACKWATER team escorted the three ESS flatbed trucks

through the center of Fallujah, they were ambushed by hostile Iraqi insurgents. Since the team

was driving without a rear-gunner and did not have armored vehicles, the insurgents were able to

literally walk up behind the vehicles and shoot all four men with small arms at close range. Their bodies were pulled into the streets, burned and their charred remains were beaten and dismembered. Ultimately, two of the burnt bodies were strung up from a bridge over the Euphrates River for all of the world to see.

62. After the March 31, 2004 ambush occurred, TOM POWELL conducted an investigation and prepared an After Action Report. This After Action Report has never been revealed outside of BLACKWATER. In fact, shortly after preparing this After Action Report, which began to reveal JUSTIN MCQUOWN's actions toward Scott Helvenston and the other team members, TOM POWELL was dismissed from his employment with BLACKWATER.

63. Plaintiff is informed and believes and thereon alleges that BLACKWATER has attempted to cover-up this deadly ambush to hide the fact Helvenston, Teague, Zovko and Batalona were all killed two days prior to the already-expedited April 2, 2004 start date for the BLACKWATER contractors to first become operational in Iraq. At the time they were killed, the BLACKWATER contractors were merely supposed to be training, gathering intelligence and riding along with the CRG teams.

64. Plaintiff is informed and believes and thereon alleges that as a further attempt to cover-up this incident, BLACKWATER fabricated critical documents. A Risk Assessment of each security detail was supposed to be done prior to the security missions, and was to be signed off by the security detail leader. Based upon the Risk Assessment, BLACKWATER was to have determined whether to perform the mission as requested by ESS. With respect to the March 31, 2004 incident, no Risk Assessment was ever done prior to the dispatch of the mission. Plaintiff is informed and believes and thereon alleges that BLACKWATER instead created one after this

20

deadly ambush occurred.

65.     Ultimately, BLACKWATER, JUSTIN MCQUOWN and TOM POWELL were responsible for sending this four-man team out without the sufficient amount of team members, without armored vehicles, without the proper weapons, and without any logistics or maps concerning the routes to be taken.  Nonetheless, after the March 31, 2004 ambush, wherein these four contractors were murdered, POWELL attempted to credit himself with saving two lives, by proudly claiming that if he had sent a six-man team, there would have been six deaths.

66.     Plaintiff is informed and believes and thereon alleges that BLACKWATER continued the pattern and practice of insufficiently training its contractors, and sending them into high-risk areas without the proper weapons, armored vehicles and logistics.  In addition to the four BLACKWATER security contractors killed on March 31, 2004, five other BLACKWATER security contractors assigned to the ESS project were also killed in Iraq.

67.     More specifically, on June 2, 2004, a BLACKWATER security contractor was killed in Iraq.  On June 5, 2004, four more BLACKWATER security contractors were killed in Iraq.  As such, in just a few weeks, BLACKWATER lost 9 of its 30 security contractors, which constitutes an incredibly high 30% death rate, which could have been avoided with proper training and equipment.

## FIRST CAUSE OF ACTION

### [Damages for Wrongful Death Against All Defendants]

68.     Plaintiffs repeat and replead Paragraphs 1 through 67, inclusive, and incorporate the same herein by reference.

21

69.    BLACKWATER, JUSTIN MCQUOWN, and TOM POWELL intentionally, deliberately and with reckless disregard for their health and safety, sent Helvenston, Teague, Zovko and Batalona, and each of them, into the very high-risk area of Fallujah without the required six (6) man team, without a minimum of two (2) armored vehicles, without a rear-runner, without heavy automatic machine guns, without 24 hours notice prior to the security mission, without having conducted a Risk Assessment to determine the threat level of the mission, without the opportunity to review the travel routes, gather intelligence regarding the mission, perform a pre-trip inspection of the route, determine the proper logistics or even review a map of the area, and without permitting them to test and sight the weapons they were actually given.

70.    When the Defendants sent Helvenston, Teague, Zovko and Batalona out on this security mission in this condition, without the proper protections, tools and information, they knew that they were sending them into the center of Fallujah with very little chance that they would come out alive.

71.    As a proximate result of the Defendants' intentional conduct, willful and wanton conduct, and/or negligence, as alleged herein above, Helvenston, Teague, Zovko and Batalona, and each of them, were killed March 31, 2004.

72.    Prior to his death, Scott Helvenston was a provider of love, support, comfort, guidance, advice and companionship to his two minor children, Kyle J. Helvenston and Kelsey E. Helvenston, as well as financial support to their mother and his.

73.    Prior to his death, Mike Teague lived with his wife Rhonda Teague and his minor son Brandon Teague to whom he was a provider of love, support, comfort, guidance, advice and

22

companionship, as well as being a faithful and dutiful husband.

74.     Prior to his death, Jerry Zovko was a provider of love, support, comfort, guidance,

advice and companionship to his mother and father, Danica Zovko and Jozo Zovko, respectively.

75.     Prior to his death, Wesley Batalona lived with his wife June Batalona to whom he

was a faithful and dutiful husband, as well as a provider of love, support, comfort, guidance,

advice and companionship to her and his daughter Kristal Batalona.

76.     As a proximate result of the aforementioned wrongful conduct of the Defendants,

and the deaths of Helvenston, Teague, Zovko and Batalona, those persons described herein, and

each of them, sustained the loss of society, companionship, comfort, guidance, kindly offerings,

advice, services, protection, care and assistance, as well as the net incomes of the decedents, and

each of them.

77.     The wrongful acts committed by BLACKWATER, as herein alleged, were

condoned, approved and ratified by its officers and directors, such as Brian Berrey and Mike

Rush, and were participated in by its managing agents, such as JUSTIN MCQUOWN and

THOMAS POWELL, and were the result of the Defendants' fraud, malice and willful and

wanton conduct, in the conscious disregard for the health and safety of others, so as to justify an

award of punitive damages.

78.     At all relevant times alleged herein, JUSTIN MCQUOWN and THOMAS

POWELL were managers of BLACKWATER SECURITY CONSULTING, LLC and/or

BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is

liable for their acts of fraud, malice and willful and wanton conduct.

79.     At all relevant times alleged herein, Brian Berrey and Mike Rush were officers

23

and/or directors of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER

LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts

of fraud, malice and willful and wanton conduct.

## SECOND CAUSE OF ACTION

**[Rescission of Written Instrument for Fraud Against BLACKWATER Defendants]**

80.     Plaintiffs repeat and replead Paragraphs 1 through 79, inclusive, and incorporate

the same herein by reference.

81.     On or about March 8, 2004, ESS, on the one hand, and REGENCY and

BLACKWATER, on the other, entered into a written contract (the PRIMARY CONTRACT) for

REGENCY and BLACKWATER to provide security services to ESS's catering operations in the

Middle East.

82.     On or about March 12, 2004, REGENCY and BLACKWATER entered into an

near identical written contract (the SUB-CONTRACT) solely to support the security services

provided for under the PRIMARY CONTRACT.  The SUB-CONTRACT expressly incorporates

by reference the terms and conditions of the PRIMARY CONTRACT.

83.     On or about March 25, 2004, Helvenston, Teague, Zovko and Batalona

individually entered into separate Independent Contractor Service Agreements with

BLACKWATER.  At all times during the negotiation of each of these Independent Contractor

Service Agreements, BLACKWATER made certain representations regarding the PRIMARY

CONTRACT and the SUB-CONTRACT, and expressly incorporated by reference the terms and

conditions of the PRIMARY CONTRACT and the SUB-CONTRACT into each and every

24

Independent Contractor Service Agreement.

84.     BLACKWATER made representations of material facts to Helvenston, Teague, Zovko and Batalona that they would receive the protections, tools and information guaranteed by the PRIMARY CONTRACT and SUB-CONTRACT if they entered into the Independent Contractor Service Agreements, all the while intentionally concealing from them, and failing to disclose to them, the fact that BLACKWATER had no intention of and would not provide Helvenston, Teague, Zovko and Batalona these protections, tools and information once they entered into the Independent Contractor Service Agreements and began working for BLACKWATER in the Middle East.

85.     More specifically, to induce Helvenston, Teague, Zovko and Batalona to each enter into their respective Independent Contractor Service Agreements, the Directors of BLACKWATER, Brian Berrey and/or Mike Rush, assured them that they would be afforded the protections set forth in the PRIMARY CONTRACT and the SUB-CONTRACT, and made the following representations of material facts:

a.     That each of their security missions would be comprised of a team of no less than six (6) members;

b.     That each of their security missions would be performed in armored vehicles;

c.     That each of their security teams would be comprised of the two armored vehicles, with at least three security contractors in each vehicle, which would provide for a driver, a navigator, and a rear-gunner;

d.     That each of their security missions would have a rear-gunner with a

25

heavy automatic weapon, such as a "SAW Mach 46," which could fire up to 850 rounds per minute, allowing the gunner to fight off any attacks from the rear;

      e.      That they would be given at least 24-hours notice prior to any security mission;

      f.      That each of their security missions would be subject to a Risk Assessment completed prior to the mission, and that if the threat level was too high, they would have the option of not performing the mission;

      g.      That they would be afforded the opportunity to review the travel routes, gather intelligence about each mission, do a pre-trip inspection of the route and determine the proper logistics to carry out the security missions; and

      h.      That they would arrive in the Middle East and have at least 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through area.

These representations, as well as others, were made to induce Helvenston, Teague, Zovko and Batalona to each enter into their respective Independent Contractor Service Agreements.

86.      These representations of material facts by BLACKWATER concerning the protections which would be afforded to Helvenston, Teague, Zovko and Batalona, if they executed their individual Independent Contractor Service Agreements, were false. The true facts were as follows:

      a.      BLACKWATER did not provide them with the minimum number of six (6) members on their security mission;

      b.      BLACKWATER did not provide them with armored vehicles for their security mission;

26

      c.      BLACKWATER did not permit them to have three (3) team members in each vehicle, which resulted in each vehicle containing only a driver and a navigator, but no rear-gunner to quell any attacks;

      d.      BLACKWATER did not provide them with heavy automatic machine guns, but instead merely with semi-automatic rifles;

      e.      BLACKWATER did not provide them with 24-hours notice of their security mission;

      f.      BLACKWATER did not conduct a Risk Assessment prior to their security mission;

      g.      BLACKWATER did not provide them with the opportunity to gather intelligence concerning the travel routes, do a pre-route inspection, and even refused to give them maps of the area; and

      h.      BLACKWATER did not transport them to the Middle East 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through Iraq, but instead they were sent over only a few days before they became operational.

      87.      When the Defendants made these representations of material facts, the Defendants knew that they were false, or made them recklessly without any knowledge of their truth or falsity, as a positive assertion. The Defendants knew these representations to be false at all times herein mentioned and concealed and suppressed the true facts, although the true facts were known to them.

      88.      These false representations, suppressions and concealment by the Defendants were made with the intent to induce the Helvenston, Teague, Zovko and Batalona, and each of

27

them, to rely on them, and with the intention that they would be acted upon by Helvenston,
Teague, Zovko and Batalona, and each of them, in entering into their respective Independent
Contractor Service Agreements with BLACKWATER.

89.    Helvenston, Teague, Zovko and Batalona, and each of them, in fact relied upon
the misrepresentations of materials facts and non-existence of the facts suppressed and concealed
by the Defendants, and acted upon them by entering into their respective Independent Contractor
Service Agreements with BLACKWATER. Had the true facts been known by Helvenston,
Teague, Zovko and Batalona, each and every one of them would not have entered into their
respective Independent Contractor Service Agreements. This reliance by Helvenston, Teague,
Zovko and Batalona was reasonable and justified, in that they were told about the protections,
tools and information guaranteed by the PRIMARY CONTRACT and the SUB-CONTRACT,
were told that the same would be afforded to them, and they were completely unaware that the
Defendants were going to denying them those protections, tools and information once they
entered into their respective Independent Contractor Service Agreements and traveled to the
Middle East.

90.    In or about March 2004, BLACKWATER committed the aforementioned fraud,
deceit, suppression and/or concealment of material facts known to them by failing to provide the
protections, tools and information represented to these contractors in inducing them to enter into
their respective Independent Contractor Service Agreements and accept employment with
BLACKWATER for the ESS project. This cause of action for rescission of the written
instruments for fraud relating to the Helvenston's, Teague's, Zovko's and Batalona's
Independent Contractor Service Agreements arose prior to their deaths, and Helvenston, Teague,
Zovko and Batalona would have been the plaintiffs of this cause of action had they lived.

28

91.     Helvenston, Teague, Zovko and Batalona suffered damages as a proximate cause of the Defendants' fraudulent conduct in inducing them to enter into their respective Independent Contractor Service Agreement, in that they traveled to Iraq and attempted to perform their services under the contracts, but because the Defendants denied them the promised protections, tools and information, Helvenston, Teague, Zovko and Batalona were all killed.

92.     Plaintiffs seek rescission of each and every Independent Contractor Service Agreement entered into with BLACKWATER by Helvenston, Teague, Zovko and Batalona, in that each and every contract was entered into as the result of BLACKWATER's fraud, deceit and misrepresentation.

93.     Alternatively, Plaintiffs seek recovery of damages suffered by Helvenston, Teague, Zovko and Batalona, and each of them, in an amount currently unascertained, but according to proof at trial, resulting from, *inter alia*, BLACKWATER fraudulently and deceptively luring them away from their families and loved ones for employment under the ESS project, their mental anguish, fear and terror of being forced to travel into the center of Fallujah without the promised protections, tools and information, and the physical pain and suffering of being shot, beaten, burned, tortured and dismembered.

94.     The aforementioned wrongful conduct of the Defendants constitutes fraud, malice, and/or willful and wanton conduct, depriving Helvenston, Teague, Zovko and Batalona of their lives, their property and/or their legal rights or otherwise causing damage, injury and death, in conscious disregard of their health and safety, so as to justify an award of punitive damages.

95.     At all relevant times alleged herein, JUSTIN MCQUOWN and THOMAS POWELL were managers of BLACKWATER SECURITY CONSULTING, LLC and/or

29

BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

96.     At all relevant times alleged herein, Brian Berrey and Mike Rush were officers and/or directors of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

## PRAYER

WHEREFORE, Plaintiff prays that:

1.     Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Stephen S. Helvenston, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Steven S. Helvenston.

2.     Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Mike R. Teague, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Mike R. Teague.

3.     Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Jerko Gerald Zovko, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Jerko Gerald Zovko.

4.     Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Wesley J.K. Batalona, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Wesley J.K. Batalona.

5.     Each and every Independent Contractor Service Agreement entered into with BLACKWATER by Helvenston, Teague, Zovko and Batalona be rescinded.

30

6.    The estate of Stephen S. Helvenston recover from each of the Defendants punitive damages in the discretion of the jury.

7.    The estate of Mike R. Teague recover from each of the Defendants punitive damages in the discretion of the jury.

8.    The estate of Jerko Gerald Zovko recover from each of the Defendants punitive damages in the discretion of the jury.

9.    The estate of Wesley J.K. Batalona recover from each of the Defendants punitive damages in the discretion of the jury.

10.    Plaintiff be granted a trial by jury on all issues so triable.

11.    Plaintiff recover the attorneys' fees and costs of this action, and that those costs be taxed against the Defendants, including prejudgment interest as of the date of the filing of this complaint.

31

12.    For such other and further relief as the Court deems just and proper.

Dated: January 5, 2005                    **CALLAHAN & BLAINE, APLC**

By:    _____
       DANIEL J. CALLAHAN
       BRIAN J. McCORMACK
       MARC P. MILES
       3 Hutton Centre Drive, Suite 900
       Santa Ana, California 92707
       (714) 241-4444
       Attorneys for Plaintiff
       RICHARD P. NORDAN, as the Ancillary
       Administrator of the separate Estates of STEPHEN
       S. HELVENSTON, MIKE R. TEAGUE, JERKO
       GERALD ZOVKO and WESLEY J.K.
       BATALONA

Dated: January 5, 2005                    **KIRBY & HOLT, LLP**

By:    _____
       DAVID F. KIRBY
       WILLIAM B. BYSTRYNSKI
       3201 Glenwood Avenue, Suite 100
       Raleigh, North Carolina 27612
       (919) 881-2111
       Attorneys for Plaintiff
       RICHARD P. NORDAN, as the Ancillary
       Administrator of the separate Estates of STEPHEN
       S. HELVENSTON, MIKE R. TEAGUE, JERKO
       GERALD ZOVKO and WESLEY J.K.
       BATALONA

G:\2525\2525-02\Pleadings\Complaint.wpd

32

# Exhibit "B"

**Exhibit "B"**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:06-CV-49-F

| | | |
|---|---|---|
| BLACKWATER SECURITY | ) | |
| CONSULTING, LLC and BLACKWATER | ) | |
| LODGE AND TRAINING CENTER, INC., | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| RICHARD P. NORDAN, as Ancillary | ) | |
| Administrator for the Separate Estates of | ) | |
| STEPHEN S. HELVESTON, MIKE R. | ) | |
| TEAGUE, JERKO GERALD ZOVKO, and | ) | |
| WESLEY J. K. BATALONA, | ) | |
| Respondent. | ) | |

This matter is before the court on a petition for order directing arbitration [DE-1] filed

by Petitioners Blackwater Security Consulting, LLC and Blackwater Lodge Training Center,

Inc. [collectively, "Blackwater"] and a motion to dismiss the petition [DE-6] filed by Richard

P. Nordan, as Ancillary Administrator for the separate estates of Stephen S. Helveston, Mike

R. Teague, Jerko Gerald Zovko and Wesley J. K. Batalona [collectively, "Decedents"]. These

matters are now ripe for disposition.

## I. BACKGROUND

This matter arises out of four Independent Contractor Service Agreements ["Service

Agreements"] entered into by Blackwater and each of the Decedents. Section 20.1 of the

Service Agreement provides:

> Contractor and BSC hereby agree that any dispute regarding interpretation or
> enforcement of any of the parties' rights or obligations under this Agreement
> shall be resolved by binding arbitration according to the rules of the American
> Arbitration Association and shall be conducted in Currituck or Camden
> County in North Carolina.

Petition [DE-1] Exs. A, B, C and D at § 20.1. On March 31, 2004, Decedents were brutally

murdered in Fallujah, Iraq while working for Blackwater in support of the United States Armed Forces.

On January 5, 2005, Nordan filed an action in the Superior Court of North Carolina in Wake County alleging state law claims of fraud and wrongful death against Blackwater and Blackwater employees Justin L. McQuown and Thomas Powell. *See* Petition [DE-1] Ex. E. In the complaint, Nordan alleges that Decedents entered into the Service Agreements in reliance upon the representations of Blackwater and its employees that Decedents would be afforded certain protections, tools and information while working as security contractors in the Middle East. Although Decedents were working in hostile territory, Nordan alleges that Blackwater failed to provide the protective measures as promised. Nordan seeks relief, including compensatory damages for the wrongful death of Decedents, recision of the Service Agreements and punitive damages.

On January 24, 2005, Blackwater removed the action to the Eastern District of North Carolina on the basis of federal question jurisdiction. The action was remanded on August 11, 2005, by Chief United States District Court Judge Louise Flanagan and on August 24, 2006, the Fourth Circuit Court of Appeals concluded that it lacked appellate jurisdiction to review the remand. Pending review of the remand issue, the proceedings in Superior Court were stayed, including consideration of a motion to dismiss filed by Blackwater.

On November 27, 2006, the Superior Court lifted the stay imposed during appellate review of the remand order. Since the stay was lifted, the Superior Court has not ruled on Blackwater's motion to dismiss, but has allowed a motion by Nordan to proceed in discovery with the deposition of a witness in Alaska.

On December 14, 2006, Blackwater initiated an arbitration in Currituck County, North Carolina against Nordan. *See* Petition [DE-1] at Ex. F. Six days later, Blackwater filed a

petition in this court seeking an order pursuant to Section 4 of the Federal Arbitration Act ["FAA"], 9 U.S.C. § 4, directing Nordan to proceed with arbitration in accordance with the terms of the Service Agreements.  Nordan subsequently filed a motion to dismiss the petition, arguing that the court must abstain from consideration of the matter on the basis of *Colorado River Water Conservation District v. United States*, 420 U.S. 800 (1976).  In the alternative, Nordan maintains that Blackwater's petition must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(3), 12(b)(6) and 13(a) because Blackwater's claim is a compulsory counterclaim to the pending state action.

On April 13, 2007, Superior Court Judge Donald Stephens granted a motion for a temporary restraining order enjoining the parties from further participating in the arbitration proceedings.

Blackwater's petition and Nordan's motion to dismiss are now ripe for disposition.

## II. MOTION TO DISMISS

### A. Standard

An action will be dismissed for failing to state a claim if it appears that the plaintiff can prove no set of facts that would entitle him to relief.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  When reviewing a motion to dismiss, the court assumes the facts alleged in the complaint are true, *see McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 327 (4th Cir. 1996), and construes the allegations in the light most favorable to the pleader.  *See Scheur v. Rhodes*, 416 U.S. 232, 236 (1974).

In his motion to dismiss, Nordan maintains that Blackwater's petition must be dismissed on the following grounds: (1) the court must abstain from consideration of the petition on the basis of *Colorado River* abstention; and (2) Blackwater's petition must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(3), 12(b)(6) and 13(a) because

the claim is a compulsory counterclaim to the pending state action.

**B. *Colorado River* Abstention**

The court is not persuaded by Nordan's argument that the court should abstain from exercising jurisdiction in this action under the doctrine articulated in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). *Colorado River* abstention is appropriate "in exceptional circumstances where a federal case duplicates contemporaneous state proceedings and wise judicial administration . . . clearly favors abstention." *Vulcan Chem. Tech., Inc., v. Barker*, 297 F.3d 332, 340-41 (4th Cir. 2002) (internal quotations omitted). Prior to considering whether *Colorado River* abstention is appropriate, there is a threshold requirement of parallel proceedings in state and federal court. Once the requirement is met, the following six factors are used in analyzing whether abstention is appropriate:

> (1) whether the subject matter of the litigation involves property where the first court may assume jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*Id.* at 341. Here, the court concludes that even if the federal and state court actions can be considered parallel, application of these six factors does not counsel in favor of abstention.

The first factor is not relevant because this dispute does not involve property. The second factor does not weigh in favor of abstention because both the federal court and the state court are located in North Carolina. Nordan argues that the federal forum is inconvenient because this court is likely to require arbitration in New York. This argument is unpersuasive, as the Service Agreements provide that arbitration must take place in North Carolina.

With respect to the third factor, Nordan maintains that an order compelling arbitration would result in piecemeal litigation. The court finds that this factor does not counsel in favor of abstention. Even if an order compelling arbitration would create piecemeal litigation, "[t]hat misfortune . . . is not the result of any choice between the federal and state courts; it occurs because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 20 (1983)(emphasis in original). Here, it is not the interplay of the parallel federal and state actions that could result in piecemeal litigation, but the arbitration provision in the Service Agreements. As such, any risk of piecemeal litigation does not weigh in favor of abstention. *See Eastern Associated Coal Corp. v. Skaggs,* 272 F. Supp. 2d 595, 600 (S.D.W.Va. 2003).

The fourth factor requires consideration of the order in which the courts obtained jurisdiction and the progress achieved in each action. "[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 21.

Nordan instituted the state court action on January 5, 2005, almost two years before the instant petition was filed in federal court on December 20, 2006. As described above, the state court action was stayed until November 27, 2006. Since removal of the stay, the state court has allowed limited discovery and entered a temporary restraining order preventing further steps toward arbitration. The state court has not ruled on Blackwater's motion to dismiss, which includes as grounds for dismissal the fact that Nordan's claim for recision is subject to arbitration. Analyzing these circumstances from a practical perspective, the state court action was initiated first, but has not progressed on the issue of arbitration. Consequently, it does not appear that the fourth factor weights in favor of abstention.

Moreover, abstention by this court could delay arbitration of this matter and subvert "Congress's clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Id.* at 22 (holding that abstention by a district court "frustrated the statutory policy of rapid and unobstructed enforcement of arbitration agreements").

The fifth factor concerns whether state or federal law provides the rule of decision on the merits. The instant action is governed by both North Carolina law and the FAA. Although "the presence of state-law issues may weigh in favor of . . . surrender [of jurisdiction]," the Supreme Court has provided that "the presence of federal-law issues must always be a major consideration weighing *against* surrender." *Id.* at 26 (emphasis added). Consequently, because the FAA is applicable, this factor does not weigh in favor of abstention.

Finally, the court must consider the adequacy of the state proceeding in protecting the parties' rights. Here, there is room for doubt concerning the state court's ability to compel arbitration, as the state court has allowed limited discovery before ruling on the arbitration issue. This factor, therefore, weighs against abstention.

Having carefully considered the parties' motions and the applicable law, the court concludes that *Colorado River* is not appropriate in this action and Nordan's motion to dismiss on this basis is DENIED.

## C. Compulsory Counterclaim

Nordan also seeks dismissal of Blackwater's petition pursuant to Federal Rules of Civil Procedure 12(b)(3), 12(b)(6) and 13(a) on the grounds that the FAA petition constitutes a compulsory counterclaim in the pending state action. Nordan has not cited, nor can the court find, any legal precedent in support of this argument. Consequently, Nordan's motion to

dismiss the petition on this basis is DENIED.

### III. PETITION

The court now turns to Blackwater's petition seeking relief pursuant to § 4 of the FAA,

which provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to
> arbitrate under a written agreement for arbitration may petition any United
> States district court which, save for such agreement, would have jurisdiction
> under Title 28, in a civil action or in admiralty of the subject matter of a suit
> arising out of the controversy between the parties, for an order directing that
> such arbitration proceed in the manner provided for in such agreement. . . . .
> The court shall hear the parties, and upon being satisfied that the making of
> the agreement for arbitration or the failure to comply therewith is not in issue,
> the court shall make an order directing the parties to proceed to arbitration in
> accordance with the terms of the agreement.

9 U.S.C. § 4. The FAA itself does not create an independent basis for federal jurisdiction. *See*

*Moses H. Cone Mem. Hosp.*, 460 U.S. at 26 n. 32. Accordingly, in examining an FAA petition,

the court must first consider the issue of subject matter jurisdiction.

The court concludes that it would have jurisdiction over this action pursuant to 28

U.S.C. § 1332, as this is a civil matter between citizens of different states wherein the amount

in controversy exceeds $75,000. Specifically, Blackwater Security Consuling, LLC and

Blackwater Lodge Training Center, Inc. are both organized under the laws of the State of

Delaware, with principal places of business in North Carolina. Nordan is a resident of North

Carolina and the Decedents were, at the time of death, residents of California, Hawaii,

Tennessee and Ohio. There is complete diversity of citizenship, as Nordan's personal

citizenship as administrator is disregarded. *See* 28 U.S.C. § 1332(c)(2) ("the legal

representative of the estate of a decedent shall be deemed to be a citizen only of the same

State as the decedent"). The parties do not dispute that the amount in controversy exceeds

$75,000, therefore the court has subject matter jurisdiction over this action.

Having concluded that jurisdiction is proper, the court must next determine whether

to stay the instant proceedings and direct the parties to proceed to arbitration in accordance

with the Service Agreements.[1]  A petitioner can compel arbitration by establishing:

> (1) the existence of a dispute between the parties, (2) a written agreement that
> includes an arbitration provision which purports to cover the dispute, (3) the
> relationship of the transaction, which is evidenced by the agreement, to
> interstate or foreign commerce, and (4) the failure, neglect or refusal of the
> defendant to arbitrate the dispute.

*Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting *Whiteside v. Teltech*

*Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)).

The court finds that Blackwater has satisfied each of these four factors.  The first factor

has been met, as there is undoubtedly a dispute between the parties.  Second, as described

above, there are written Service Agreements purporting to cover the dispute that include an

arbitration provision providing that "any dispute regarding interpretation or enforcement of

any of the parties' rights or obligations under this Agreement shall be resolved by binding

arbitration."  A written arbitration provision "shall be valid, irrevocable, and enforceable,

save upon such grounds as exist at law or in equity for the revocation of any contract."  9

U.S.C. § 2.

The court is not persuaded by Nordan's argument that this action is not subject to

arbitration because "this federal proceeding concerns an attempt to enforce a contractual

provision of a contract which itself is the subject of a fraud in the inducement cause of action

in state court that could render the entire contract rescinded."  Mem. in Support of Mot. to

Dimiss [DE-7] at p. 6.  The fact that Nordan has filed a claim fraud in the inducement claim in

state court is no bar to arbitration proceedings.

In both state and federal court, "an arbitration provision is severable from the

---

[1]The court declines to hold a jury trial or hearing before issuing the instant order, as
there are no disputed issues of material fact concerning the merits of arbitrability.

issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). Here, Nordan does not allege fraudulent inducement of the arbitration clause itself, but alleges fraud in the inducement of the Service Agreements generally. In this circumstance, the issue of fraud in inducement must be considered by the arbitrator, not a state or federal court. See *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 813-14 (4th Cir. 1989)(examining Supreme Court precedent and noting that a claim of "fraud in the inducement of the contract generally" is an issue "for the arbitrator").

Finally, the court also finds that there is no dispute as to the third and fourth factors required to compel arbitration. As to the third factor, the transaction between Blackwater and Decedents related to interstate or foreign commerce. As the fourth factor, it is plain that Nordan has refused to arbitrate the dispute by seeking recision of the Service Agreements in state court.

The court therefore finds that Blackwater has established the requisite factors in favor of compelling arbitration in this case and concludes that "a valid agreement to arbitrate exists between the parties and covers the matter in dispute." *Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999). In this circumstance, "the FAA commands the federal courts to stay any ongoing judicial proceedings . . . and to compel arbitration." *Id.*; *see* 9 U.S.C. § 3 (providing that a court must stay any suit "referable to arbitration under an agreement in writing for such arbitration."). "This stay-of-litigation provision is mandatory. A district court therefore has no choice but to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins*, 303 F.3d at 500. Accordingly, the court finds that this matter must be stayed and the parties directed to proceed with

arbitration in accordance with the Service Agreements.[2]

### IV. CONCLUSION

Based upon the foregoing , it is therefore ORDERED that:     .

1. Blackwater's petition for order directing arbitration [DE-1] is ALLOWED and the parties are ORDERED to proceed with arbitration in the manner provided for in the Service Agreements.

2. This action is STAYED pending completion of the required arbitration.

3. Nordan's motion to dismiss [DE-6] is DENIED.


SO ORDERED.

This the 20 day of April, 2007.

_____
James C. Fox
Senior United States District Judge


-------------------------------------

[2]The court declines to allow Blackwater's request to enter a stay of the underlying state court action as this court "believes that the parties and the [state court] will likely conform their conduct to the expectations of law." *United Service Protection Corp. v. Lowe*, 354 F. Supp. 2d 651, 659 (S.D.W.Va. 2005) (internal citations omitted).

# Exhibit "C"

**Exhibit "C"**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:06-CV-49-F

BLACKWATER SECURITY              )
CONSULTING, LLC and BLACKWATER   )
LODGE AND TRAINING CENTER, INC., )
        Petitioners,            )
                                 )
     v.                          )        O R D E R
                                 )
RICHARD P. NORDAN, as Ancillary  )
Administrator for the Separate Estates of )
STEPHEN S. HELVESTON, MIKE R.    )
TEAGUE, JERKO GERALD ZOVKO, and  )
WESLEY J. K. BATALONA,           )
        Respondent.             )

This matter is before the court on a Motion for Order to Show Cause [DE-25] filed by

Petitioners Blackwater Security Consulting, LLC and Blackwater Lodge and Training Center,

Inc. [collectively, "Blackwater"] and an Emergency Motion for Reconsideration [DE-14] and

Motion for Relief from Order [DE-20] filed by Respondent Richard P. Nordan.  These matters

are now ripe for disposition.

This action arises out of four Independent Contractor Service Agreements ["Service

Agreements"] entered into by Stephen S. Helveston, Mike R. Teague, Jerko Gerald Zovko and

Weskley J. K. Batalona [collectively, "Decedents"], which provided *inter alia*:

> Contractor and [Blackwater] hereby agree that any dispute regarding
> interpretation or enforcement of any of the parties' rights or obligations under
> this Agreement shall be resolved by binding arbitration according to the rules
> of the American Arbitration Association and shall be conducted in Currituck or
> Camden County in North Carolina.

Petition [DE-1] Exs. A, B, C and D at § 20.1.  On March 31, 2004, Decedents were killed while

working for Blackwater in Fallujah, Iraq.  On January 5, 2005, Nordan, as Ancillary

Administrator for the separate estates of Decedents, filed an action in the Superior Court of

1

North Carolina in Wake County alleging state law claims of fraud and wrongful death against

Blackwater and two of its employees ["Nordan's State Law Claims"].

About one year later, on December 14, 2006, Blackwater initiated an arbitration in

Currituck County, North Carolina against Nordan ["Blackwater's Arbitration Breach of

Contract Claim"]. In its Demand for Arbitration, Blackwater described its claim as:

> Breach of contract: As administrator of the estates of four Blackwater
> professionals killed by a mob of insurgents on 3/31/04 in Fallujah, Iraq,
> [Nordan] has breached decedents' contractual obligations not to sue, not to
> seek publicity and to protect classified and confidential information, to release
> Blackwater & affiliates from all claims, and to assume all risks of "being shot, . .
> . killed by a firearm . . . . terrorist activity, hand to hand combat" etc. in Iraq.

Less than one week later, on December 20, 2006, Blackwater initiated this action in

federal district court by filing a petition, maintaining that it was "entitled under Section 4 of

the Federal Arbitration Act to an Order directing [Nordan] to proceed in Currituck or Camden

County with binding arbitration of *[Nordan's] alleged claims*." Petition [DE-1] at ¶ 20

(emphasis added). In other words, Blackwater sought an order compelling arbitration of

Nordan's State Law Claims in accordance with the Service Agreements. In an order [DE-13]

filed April 20, 2007, the court allowed Blackwater's petition and ordered the parties "to

proceed with arbitration in the manner provided for in the Service Agreements." Order [DE-

13] at p. 10.

On May 4, 2007, Nordan reportedly filed a motion for a temporary restraining order

and a preliminary injunction in Wake County Superior Court. The next day, on May 5, 2007,

Nordan filed an Emergency Motion for Reconsideration [DE-14] and Motion for Relief from

Order [DE-20] in the instant action. On May 8, 2007, Blackwater filed a Motion for Order to

Show Cause [DE-25], arguing that Nordan should be sanctioned by this court for attempting

to prohibit further arbitration of Blackwater's Arbitration Breach of Contract Claim and

seeking emergency injunctive relief in state court.

Each of these motions misconstrues the court's April 20, 2007, order as compelling

arbitration of Blackwater's Arbitration Breach of Contract Claim.  To the contrary, the court's

April 20, 2007 order allowed Blackwater's petition to compel arbitration of Nordan's State

Law Claims in accordance with the Service Agreements.  The court takes no position on the

propriety of Blackwater's Arbitration Breach of Contract Claim.  Moreover, at this point, any

dispute regarding the proper arbitration procedure should be brought before the America

Arbitration Association.  Accordingly, Nordan's Emergency Motion for Reconsideration [DE-

14] and Motion for Relief from Order [DE-20] and Blackwater's Motion for Order to Show

Cause [DE-25] are DENIED.


SO ORDERED.

This the 11th day of May, 2007.

James C. Fox
Senior United States District Judge

# Exhibit "D"

**Exhibit "D"**

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

RECEIVED

MAY 1 8 2007

INTERNATIONAL CENTER

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| *MEDIATION:  If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.*  ☒  *There is no additional administrative fee for this service.* | | | | | | |
|---|---|---|---|---|---|---|
| Name of Respondent Blackwater Security Consulting, LLC, and Blackwater Lodge & Training Center, Inc. | | | Name of Representative (if known) Michael P. Socarras | | | |
| Address 850 Puddin Ridge Road | | | Name of Firm (if applicable) McDERMOTT, WILL & EMERY, LLP | | | |
| | | | Representative's Address 600 13th Street NW | | | |
| City Moyock | State NC | Zip Code 27958- | City Washington | | State DC | Zip Code 20005- |
| Phone No. (252) 435-2488 | | Fax No. (252) 435-6388 | Phone No. (202) 756-8000 | | | Fax No. (202)756-8087 |
| Email Address: | | | Email Address: msocarras@mwe.com | | | |

The named claimant, a party to an arbitration agreement dated PerCourtOrders 4/20&5/11/07 , which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE Wrongful Death and Fraud. Helvenston, Teague, Zovko and Batalona were beaten, burned, killed, dragged through the streets of Fallujah, Iraq, and hung from a bridge for the world to see on March 31, 2004. These decedents were working for Blackwater, who fraudulently induced them to enter into their employment contracts, and then intentionally sent them out on a job without the necessary weapons, tools, and protections, all in order to save costs.

| Dollar Amount of Claim  $20,000,000.00 | Other Relief Sought: ☒ Attorneys Fees  ☒ Interest  ☒ Arbitration Costs ☒ Punitive/ Exemplary  ☐ Other _____ |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
   Panel of Three Retired Judges with Civil Jury Trial Courtroom Experience

Hearing locale Currituck or Camden, NC     (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| Estimated time needed for hearings overall: _____ hours or 10 _____ days | Type of Business: Claimant ___ Administrator of Estates _____ Respondent Private Security _____ |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range?  Note: This question is required by California law. ☐Less than $100,000  ☐ $100,000 - $250,000  ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☒ Atlanta, GA  ☐ Dallas, TX  ☐ East Providence, RI  ☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)   Date:        May 15, 2007 | Name of Representative Daniel J. Callahan, Brian J. McCormack, and Marc P. Miles | | |
|---|---|---|---|
| Name of Claimant Richard P. Nordan, as ancillary administrator of separate estates of Helvenston, Teague, Zovko & Batalona | Name of Firm (if applicable) CALLAHAN & BLAINE | | |
| Address (to be used in connection with this case) 3605 Glenwood Avenue, Suite 240 | Representative's Address 3 Hutton Centre Drive, Ninth Floor | | |
| City Raleigh | State NC | Zip Code 27612- | City Santa Ana | State CA | Zip Code 92707- |
| Phone No. (919) 782-9322 | | Fax No. (919) 782-8113 | Phone No. (714) 241-4444 | | Fax No. (714) 241-4445 |
| Email Address: rnordan@wnslaw.com | | | Email Address: mmiles@callahan-law.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

SF CMC

MAY 1 7 2007

American Arbitration
Association-Tribunal

# Exhibit "E"

**Exhibit "E"**

 **International Centre for Dispute Resolution**

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

June 11, 2007

Michael P. Socarras, Esq.
McDermott Will & Emery
600 Thirteenth Street, N.W.
Washington, DC  20005-3096

Daniel Callahan, Esq.
Callahan & Blaine, APLC
3 Hutton Center Drive 9 Floor
Santa Ana, CA  92707

David F. Kirby, Esq.
Kirby & Holt, LLP
3201 Glenwood Avenue
Suite 100
Raleigh, NC  27612

Re: 50 181 T 00524 06
     Blackwater Security Consulting, LLC &
     Blackwater Lodge and Training Center, Inc.
     vs
     Richard P. Nordan

Dear Counsel,

Please note that – as of today – I am responsible for the administration of this matter.  Please take note of my contact information, set forth below.  Any and all correspondence shall be send to my attention only as far as the ICDR is concerned.

We note from the Tribunal's Order No. 2 dated May 31, 2007 that Respondent's Statement of Defense shall be filed by close of business **June 14, 2007**.

Any supplemental memoranda shall be filed by close of business **June 22, 2007** as further detailed in the Tribunal's Guidelines dated June 5, 2007.

After careful review of the parties' correspondence, the ICDR has determined that Respondent's Demand for Arbitration dated May 15, 2007 will be accepted as Respondent's Counterclaim in the above matter, subject to the Tribunal's final determination.

We have attached Respondent's Demand/Counterclaim for the Tribunal's and Claimant's consideration. We note from the Tribunal's Order No. 2 dated May 31, 2007 that Claimant's Statement of Defense to the Counterclaim is due by close of business **June 26, 2007**.

*A Division of the American Arbitration Association*

Please also find attached the most current and up-to-date invoice/statements for your client's convenience. Please be so kind to advise your client to remit payment by close of business **June 26, 2007**.

Please note that, pursuant to the International Dispute Resolution Procedures, if arbitrator compensation has not been paid in full by said date, the ICDR may so inform the parties in order that one of them may advance the required payment.  If such payments are not made, the Tribunal may order the suspension or termination of the proceedings.

If you have any questions or concerns, please do not hesitate to contact me any time via phone or e-mail.

I am looking forward to working with you for the resolution of this matter.

Sincerely,

*Christian Paul Alberti*

Christian Paul Alberti, LL.M.
Attorney-at-Law, Germany

ICDR Solutions Manager
212 484 4037
AlbertiC@adr.org

Michael Namias
ICDR Supervisor
212 484 4170
NamiasM@adr.org

cc:     Hon. William H. Webster
        Edward Dreyfus, Esq.
        Jean E. Kalicki, Esq.
        (w/o invoices)

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served a copy of the foregoing

**STATEMENT OF DEFENSE AND COUNTERCLAIM** upon all other parties to this cause

by electronic mail, addressed to the following parties:

| | |
|---|---|
| Michael P. Socarras<br>McDermott Will & Emery, LLP<br>600 Thirteenth Street, NW<br>Washington, DC 20005-3096<br>MSocarras@mwe.com | Attorneys for Defendant Blackwater |
| Kirk G. Warner<br>Mark A. Ash<br>SMITH, ANDERSON, BLOUNT,<br>DORSETT, MITCHELL & JERNIGAN, LLP<br>P.O. Box 2611<br>Raleigh, NC 27602<br>mash@smithlaw.com | Attorneys for Defendant Blackwater |

This the 14th day of June, 2007.

_____/s/Marc P. Miles_____
MARC P. MILES